UNITED STATES of America,
Plaintiff,

v.

PENN–OLIN CHEMICAL COMPANY,
Olin Mathieson Chemical Corporation
and Pennsalt Chemicals Corporation,
Defendants.

Civ. A. No. 2282.

United States District Court
D. Delaware.

May 1, 1963.

Alexander Greenfeld and Leonard G. Hagner, U. S. Attys., District of Delaware, Wilmington, Del., Daniel J. Freed and Edward A. Copley, Justice Dept., Antitrust Division, Washington, D. C., for United States.

William S. Potter (Berl, Potter & Anderson), Wilmington, Del., for defendants.

H. Francis DeLone and John T. Subak (Dechert, Price & Rhoads), Philadelphia, Pa., for Pennsalt Chemicals Corp.

Albert R. Connelly and John W. Barnum (Cravath, Swaine & Moore), New York City, for Olin Mathieson Chemical Corp.

STEEL, District Judge.

The Government has brought a civil action against Penn-Olin Chemical Company (Penn-Olin), Olin Mathieson Chemical Corporation (Olin), and Pennsalt Chemicals Corporation (Pennsalt), in which it seeks to prevent and restrain them from allegedly continuing to violate Section 1 of the Sherman Act, 15

U.S.C. § 1, and Section 7 of the Clayton Act, 15 U.S.C. § 18.[1]

The primary attack of the Government is directed against a joint venture between Pennsalt and Olin, pursuant to which they jointly organized and have controlled Penn-Olin for the purpose of having it construct a plant at Calvert City, Kentucky to produce and sell sodium chlorate. The Government charges that the effect of the joint venture and of the action of the parties thereunder may be to substantially lessen competition and tend to create a monopoly not only in sodium chlorate, but also in other non-chlorate chemicals, in violation of Section 1 of the Sherman Act and Section 7 of the Clayton Act. By an amendment to its complaint the Government has also charged that agreements between Pennsalt and Olin entered into in December 1957 and February 1958, denominated, respectively, the "sales agreement" and the "production agreement", restrain trade and commerce in sodium chlorate in violation of Section 1 of the Sherman Act.

## JURISDICTION

The Court has jurisdiction over the person of each defendant, and by virtue of Section 15 of the Clayton Act, 15 U.S.C. § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, it has jurisdiction over the subject matter of the action.

## THE DEFENDANTS

Pennsalt is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. It is a chemical company engaged in the production and sale of about 400 chemicals and chemical products, at fifteen plants located in eleven states as follows:

| | |
|---|---|
| Alabama | Ohio |
| California | Oregon |
| Georgia | Pennsylvania (2 plants) |
| Illinois | |
| Kentucky (2 plants) | Texas (3 plants) |
| Michigan | Washington |

Pennsalt's nationwide sales operations are conducted from its headquarters in Philadelphia and from 18 regional offices located in 13 states as follows:

| | |
|---|---|
| Alabama | New York |
| California (3 offices) | Ohio (2 offices) |
| | Oregon |
| Georgia | Pennsylvania |
| Illinois (2 offices) | Texas (2 offices) |
| Michigan | Washington |
| Missouri | Wisconsin |

Pennsalt has been engaged in the chemical business for over 110 years. In 1960 its sales amounted to over $90,000,000 on which it earned almost $5,000,000. During the same year, its assets were approximately $90,000,000. Since 1958 it has been engaged in a $55,000,000 capital

---

1. Section 1 of the Sherman Act provides in pertinent part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal."

Section 7 of the Clayton Act reads in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

* * * * *

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition."

investment program for the modernization and expansion of existing facilities and the construction of new ones.

Olin is a corporation organized under the laws of Virginia with its principal place of business in New York City. It is a diversified industrial corporation. The Chemical Division is one of seven operating divisions, and accounts for approximately 30% of the corporation's operating revenues. Olin's Chemicals Division produces a great number and variety of chemicals and chemical products from plants located in 15 states as follows:

| | |
|---|---|
| Alabama | Mississippi |
| Arizona | Nebraska |
| Arkansas | New York |
| Georgia | North Carolina |
| Illinois | Pennsylvania |
| Kentucky | Texas |
| Louisiana | Virginia |
| Maryland | |

Olin was formed in 1954 by the merger of Olin Industries, Inc., and Mathieson Chemical Corporation. Olin's activity in the chemical business reaches back, through its predecessor, Mathieson Chemical Corporation, to 1892. In 1960 Olin had sales of $690,000,000 on which it earned a net profit of $35,000,000. Its assets during that year amounted to $860,000,000. During 1960 its capital expenditures were almost $49,000,000. Net sales of its chemical division in 1960 amounted to $217,000,000.

Penn-Olin is a Delaware corporation which was organized on February 25, 1960 by Olin and Pennsalt pursuant to a joint venture agreement between them dated February 11, 1960. Pennsalt and Olin each own one-half of Penn-Olin's capital stock. The officers of Penn-Olin are divided equally between officers of Pennsalt and officers of Olin. The board of directors of Penn-Olin is comprised equally of representatives of Pennsalt and those of Olin. Penn-Olin has no officers, directors or employees who are not concurrently employed by either Pennsalt or Olin. Penn-Olin constructed

a plant at Calvert City, Kentucky at a cost of $6,454,000, for the production of 26,500 tons of sodium chlorate per year. It commenced production on September 1, 1961. By agreements executed in October 1961, dated as of January 2, 1961, Pennsalt undertook to operate the Penn-Olin plant and Olin agreed to sell its output.

All of the defendants are engaged in interstate commerce.

## THE ASSERTED ILLEGALITY OF THE JOINT VENTURE

The Government claims that each of the defendants was engaged in interstate commerce at the time when Pennsalt and Olin acquired the stock of Penn-Olin, that the acquisition of such stock was tantamount to an indirect acquisition by Pennsalt and Olin of the assets of the other at a time when each was subject to the jurisdiction of the Federal Trade Commission, and that the joint venture and the actions taken thereunder may result in a substantial lessening of competition in one or more sections of the country, or tend to create a monopoly, in sodium chlorate and other non-chlorate chemicals. For these reasons it is charged that Section 7 of the Clayton Act has been violated. The Government also charges that regardless of whether the joint venture involved an acquisition of stock or assets banned by Section 7 of the Clayton Act, it nevertheless constituted a combination in restraint of trade in violation of Section 1 of the Sherman Act.

The defendants deny the anticompetitive or monopolistic effect of the joint venture and assert that competition in the manufacture and sale of sodium chlorate has been increased by Penn-Olin entering the field. Defendants also contend that Section 7 of the Clayton Act is without application because, defendants say, Penn-Olin was not engaged in commerce when its stock was acquired by Olin and Pennsalt, and neither Olin nor Pennsalt acquired any interest in

the assets of the other when they acquired Penn-Olin stock.[2]

The last defense will not be discussed since, for the reasons hereafter stated, the joint venture did not have the anticompetitive effect at which Section 7 was aimed. The Sherman Act challenge will also be disregarded, for the anticompetitive standard imposed by Section 7 of the Clayton Act is less stringent than that of the Sherman Act. Brown Shoe Co. v. United States, 370 U.S. 294, 329, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

Broadly speaking, the Section 7 issues to be resolved are whether the effect of the joint venture:

1. May be to substantially lessen competition or tend to create a monopoly;

2. In any section of the country;

3. In any line of commerce.

These question will be discussed in inverse order:

*The Relevant Lines of Commerce*

The parties agree that two "line[s] of commerce" within the meaning of Section 7 of the Clayton Act are relevant to this case: sodium chlorate, and of the non-chlorates, calcium hypochlorite.[3]

### Sodium Chlorate

Sodium chlorate is a white crystalline chemical. It is produced commercially by the electrolysis of an acidified solution of salt (sodium chloride). The process is closely akin to that used in the commercial production of chlorine and caustic soda. Sodium chlorate of like purity is a fungible commodity. Any which is produced for sale by a domestic producer is reasonably interchangeable with that of any other domestic producer.

In 1960 over 91,000 tons of sodium chlorate, valued at close to $18,000,000, were produced in the United States. The domestic production of sodium chlorate has increased greatly within the last ten years. From 1950–1955, the domestic production of sodium chlorate more than doubled, rising from 22,085 tons in 1950 to 46,972 tons in 1955. From 1950–1960, the production of sodium chlorate more than quadrupled, rising from 22,085 tons in 1950 to 91,900 tons in 1960.

In 1960, over 54,600 tons of sodium chlorate were produced east of the Rockies and 37,300 tons produced west. At the prevailing prices (9 cents per pound in the east and 10½ cents per pound in the west), eastern production was valued at over $9.8 million while western production amounted to $7.8 million.

The largest consumer of sodium chlorate is the pulp and paper industry. That industry uses sodium chlorate in the bleaching of pulp for brighter, higher quality paper. The pulp and paper manufacturers use sodium chlorate as a principal raw material to generate chlorine

---

2. Defendants also argue that if these contentions are rejected, Penn-Olin must be regarded as a subsidiary of Olin and Pennsalt formed to carry on a lawful extension of their business, within the contemplation of the third paragraph of Section 7 of the Clayton Act (the second paragraph of the Act quoted in footnote 1). Hence, it is argued that defendants have violated Section 7 only if the effect of Penn-Olin's organization "is" and not "may be" substantially to lessen competition. It is unnecessary to consider this point in view of the determination that the joint venture probably will not adversely affect competition.

3. The parties have stipulated: Olin and Pennsalt each produce and sell in commerce in the United States the following non-chlorates: ammonia, calcium hypochlorite, caustic soda, chlorine, hydrochloric acid, hydrofluoric acid and sulphuric acid. Competition, if any, in the sale of hydrochloric acid and sulphuric acid is de minimus. Olin and Pennsalt compete in the sale of the remaining five chemicals. Of these, calcium hypochlorite has been selected as a "guinea pig" to determine whether the joint venture constitutes a violation of the antitrust laws in the case of non-chlorate chemicals. The presence or absence of substantial competition between Olin and Pennsalt with respect to the production and sale of ammonia, caustic soda, chlorine, and hydrofluoric acid or of the existence of any relevant market for such chemicals, is not relevant to the determination of any issue in the case.

dioxide, a gaseous material which possesses the unique ability to bleach cellulose fibers to a maximum whiteness with little or no loss of fiber strength. In 1958 70,541 tons of sodium chlorate were used commercially in the United States. Of this, 29,000 tons, or 41.1%, were used in pulp and paper bleaching. The next largest amount, 16,100 tons, or 22.8%, was used for herbicides (weed control). In 1960, the national shipments amounted to 81,928 tons of which 52,415, or 64%, were for pulp and paper mill consumption. Of the 47,036 tons shipped into the southeast in 1960, 39,563 tons, or 84%, were consumed by pulp and paper mills.

The recent growth of the sodium chlorate market is largely due to the adoption and rapid expansion of chlorine dioxide bleaching in the pulp industry.

In addition to its use by the pulp and paper industry, sodium chlorate is also used in agricultural chemicals (herbicides and defoliants) and in the production of ammonium perchlorate and other derivatives.

Since 1953 and prior to Penn-Olin, three producing companies, or their predecessors, have constituted the sodium chlorate industry in the United States: Hooker Chemical Corporation (Hooker), American Potash & Chemical Corporation (AmPot), and Pennsalt. Imports of sodium chlorate, stipulated to have been not substantial, have been as follows:

| | |
|---|---|
| 1956 | 892 tons |
| 1957 | 335 tons |
| 1958 | 1,322 tons |
| 1959 | 2,596 tons |
| 1960 | 4,152 tons |

Hooker is the largest producer and seller of sodium chlorate in the United States. In 1956 Hooker acquired Oldbury Electro Chemical Company (Oldbury) which had produced sodium chlorate at Niagara Falls, New York since about 1900 and which, in 1954, had constructed a plant in Columbus, Mississippi to meet the growing demand for sodium chlorate in the southeast. At the time when Oldbury constructed its Columbus plant, it had no other facilities or activities at or near Columbus. The capacity of Hooker's Columbus plant was increased in 1956, 1958 and 1960; the capacity of the Niagara Falls plant was decreased in 1961. The capacity of Hooker's two plants has been as follows:

| | Niagara Falls | Columbus |
|---|---|---|
| 1957 | 12,000 tons | 17,435 tons |
| 1958 | 12,000 tons | 21,340 tons |
| 1959 | 12,000 tons | 29,150 tons |
| 1960 | 18,000 tons | 32,000 tons |
| 1961 | 14,000 tons | 32,000 tons |

In 1960 Hooker had assets of $187,000,000 and net sales of $150,000,000.

AmPot is the second largest producer and seller of sodium chlorate in the United States. It entered the business in November 1955 by acquiring Western Electro Chemical Company (Western). The latter had a single plant at Henderson, Nevada, where it had produced sodium chlorate since 1941. In February 1957 AmPot authorized construction of a sodium chlorate plant at Aberdeen, Mississippi to meet the growing demand in the southeast, and to compete effectively in that market with Hooker's Columbus, Mississippi plant. AmPot has twice expanded the capacity of the original Aberdeen plant. The capacity of the two AmPot plants has been as follows:

| | Henderson | Aberdeen |
|---|---|---|
| 1957 | 27,000 tons | —— |
| 1958 | 27,000 tons | —— |
| 1959 | 27,000 tons | 12,000 tons |
| 1960 | 27,000 tons | 15,000 tons |
| 1961 | 28,000 tons | 22,500 tons |

In 1959 the total assets of AmPot were $73,000,000 and its net sales in that year were $50,500,000. AmPot uses the Solvay Process Division of Allied Chemical and Dye Corporation (Allied Chemical) as its sales agent for sales of sodium chlorate to the pulp and paper and textile industries. Allied Chemical is a leading producer and seller of chemicals in the United States. Allied Chemical uses its

large sales force and large technical service facilities and the Solvay process for generating chlorine dioxide in selling sodium chlorate produced by AmPot. In 1960 Allied Chemical had assets of $801,000,000 and sales and operating revenues of $766,000,000.

When AmPot's sodium chlorate plant at Aberdeen went on stream, Solvay was almost entirely responsible for selling the output of that plant. Today, the direct selling of the Aberdeen sodium chlorate output is largely AmPot's responsibility. AmPot contributes approximately 70% of the direct selling effort.

The percentages of sodium chlorate sales made by Hooker and AmPot in 1960 were as follows:

| | U. S. | East of Rockies | Southeast |
|---|---|---|---|
| Hooker | 45.9% | 54.6% | 49.6% |
| American Potash | 35.6% | 37.9% | 41.7% |
| Totals | 81.5% | 92.5% | 91.3% |

Pennsalt has produced sodium chlorate at Portland, Oregon since 1941 which it had sold principally west of the Rockies. The following tabulation sets forth its initial productive capacity at Portland and its expansion of that plant to date:

| | Tons Per Year |
|---|---|
| October 1941 | 2,194 |
| October 1942 | 3,448 |
| January 1943 | 4,248 |
| December 1949 | 5,448 |
| February 1954 | 7,848 |
| October 1957 | 12,392 |
| October 1959 | 15,392 |

Until the early 1950's, Pennsalt's sales of sodium chlorate were principally for herbicidal use and virtually no sales were made to pulp and paper mills. At that time Solvay, which was selling sodium chlorate produced by AmPot, began offering its chlorine dioxide process to the pulp and paper industry conditioned upon the user purchasing its sodium chlorate requirements exclusively from Solvay. This led Pennsalt, in mid-1953, to enter into an agreement with Mathieson under which Pennsalt was permitted to install the Mathieson process in all the paper mills in the northwest.[4] After this occurred, Solvay was never again successful in putting in its process in the northwest, and by 1960 Pennsalt had attained 100% of the sodium chlorate business of the western pulp and paper industry.

In July 1961 a fourth company, Pittsburgh Plate Glass Company (PPG), announced that it would construct a 15,000 ton per year sodium chlorate plant at Lake Charles, Louisiana. PPG is a large, diversified industrial corporation which produces and sells chemicals through its Chemical Division, formerly a subsidiary company, Columbia Southern. PPG has large technical service, sales, market research, and laboratory forces already serving the southeastern pulp and paper industry. In 1960 PPG had total assets of $625,000,000 and net sales of $628,000,000.

A fifth company, Pacific Engineering & Production Company of Nevada (Pacific), with the aid of a loan of $2,400,000 from American Cyanamid Company, is constructing at Henderson, Nevada a sodium chlorate plant with a capacity of 5,000 tons per year to commence production late in 1962. For its loan American Cyanamid received a promissory note of Pacific secured by deed of trust on all of Pacific's assets, an option to receive license on Pacific's processes, and an option to acquire all the assets of Pacific or 50% of its common stock. American Cyanamid is a leading producer and seller of chemicals in the United States.

Olin has never manufactured sodium chlorate for sale or been an independent seller of it. For years, however, it and its predecessor Mathieson has manufactured sodium chlorite which was sold to pulp and paper mills. The sodium chlorite, when dissolved in an acid

4. See footnote 5.

solution by the mills, generated chlorine dioxide which the mills used as a bleaching agent for the pulp.[5] The raw material used in the manufacture of sodium chlorite is sodium chlorate. In the early 1930's Mathieson produced sodium chlorate chemically for its own use in manufacturing sodium chlorite. During the late 1930's it stopped manufacturing sodium chlorate and turned to buying it. Approximately 5,000 tons of sodium chlorite are sold in the United States annually. Olin is the only domestic producer and 1960 was its best year.

### Calcium Hypochlorite

Calcium hypochlorite, like sodium chlorate, is used in the production of pulp and paper. There are three important competitors in calcium hypochlorite: Olin, Pennsalt, and PPG.

In 1959 Pennsalt and Olin together accounted for $6,480,000 sales, or 88.8% of all calcium hypochlorite sold in the United States. Their respective market shares were:

| | |
|---|---|
| Olin | 62.4% |
| Pennsalt | 26.4% |

In 1960 Pennsalt and Olin accounted for 76.6% of the $6,900,000 sales of calcium hypochlorite throughout the United States. Ninety-nine percent of each company's sales were made in 43 states where both sold the product.

The competition between Olin and Pennsalt in the sale of calcium hypochlorite is substantial.

### The Relevant Market

■ Section 7 of the Clayton Act is aimed at a substantial lessening of competition in "any section of the country", or, as the statute is frequently paraphrased, in any relevant market. Whether a given transaction may substantially lessen competition depends upon its probable effect in a relevant market. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The delineation of a relevant market is therefore a necessary predicate for determining the anticompetitive effect of any transaction challenged under Section 7. Brown Shoe Co. v. United States, supra, 370 U.S. p. 335, 82 S.Ct. p. 1529.

### Calcium Hypochlorite

In calcium hypochlorite the parties agree that the national market is the relevant one.

### Sodium Chlorate

The parties likewise agree that there is a relevant southeastern market in sodium chlorate, and although they define this market somewhat differently, the difference is not significant.[6]

But here agreement ends. The Government claims that there are two other

---

5. As a result of research which Mathieson did in chlorine dioxide, it developed the so-called Mathieson process for generating chlorine dioxide to bleach pulp without damaging the fibers. The process was designed to sell sodium chlorite as a new commercial chemical.

 While the process of releasing chlorine dioxide from sodium chlorite is relatively easy and inexpensive compared to the generation of chlorine dioxide from sodium chlorate, in large scale production there is a three to one cost advantage in bleaching with chlorine dioxide made from chlorate instead of chlorite. This led Olin to realize that sodium chlorate would soon become the raw material for the process. In the early 1950's therefore Olin began to make its chlorine dioxide

generation process available free to pulp and paper industry.

6. The Government asserts that the southeastern market includes Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia and West Virginia. Defendants say that Kansas, Missouri and West Texas should be excluded. According to the Government, the exclusion of these two and one-half states makes scant difference. Consequently, in the following discussion Kansas and Missouri will be excluded, but the whole of Texas will be included. No evidence warrants splitting Texas and much of the evidence bearing upon competition treats it as an entity.

relevant markets: the national market and the eastern market.

The national market, as the name implies, embraces the entire continental United States, except Alaska. The finding of a national market is important in the Government's view because it is said to put Pennsalt, Olin and Penn-Olin in the same area, to establish that Pennsalt and Olin should have been actual competitors, as a matter of law, at the time of Penn-Olin's creation, and to determine that Pennsalt and Penn-Olin were actual competitors, as a matter of law, following Penn-Olin's creation. Defendants deny that a national market exists.

The eastern market is defined as the entire United States east of the Continental Divide. It excluded only the states lying west of the Rocky Mountains, viz, Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington and Wyoming. Defendants say that the statistical analysis of the competitive effect of Penn-Olin is the same regardless of whether the eastern or southeastern market is deemed to be relevant, and that it is immaterial whether there is a relevant eastern market. This position, asserted both in defendants' brief and at the argument, was not controverted by the Government. It has made no effort to show a difference, significant in antitrust law, between the competition effect of the challenged transactions in the so-called eastern as against the southeastern market. The Court does not therefore feel called upon to make an independent analysis of the problem. So the issue is the narrow one whether the southeast is the only relevant market, or whether there is a relevant nationwide market as well

▆▆ A market is relevant in determining whether a given transaction may substantially lessen competition only if it is an area of effective competition. Standard Oil Co. v. United

States, 337 U.S. 293, 300, n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949); United States v. Maryland and Virginia Milk Producers Ass'n, 167 F.Supp. 799, 802 (D.D.C.1958), aff'd 362 U.S. 458, 80 S. Ct. 847, 4 L.Ed.2d 880 (1960). The two terms—area of effective competition and relevant market—are synonymous. Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. p. 328, 81 S.Ct. p. 628.

▆▆ Whether a geographic location is or is not an area of effective competition in a given case is a question of fact. Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal legalistic one. The geographic market in which the anti-competitive effect of a transaction is to be tested must both correspond to the commercial realities of the industry and be economically significant. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 336–337, 82 S.Ct. pp. 1529–1530 (1962). It can be defined only in the light of the overall objectives of Section 7 and with particular recognition that it is being defined for the purpose of determining the reasonable probability of substantially lessening competition. United States v. Bethlehem Steel Corp., 168 F. Supp. 576, 588 (S.D.N.Y.1958).

▆ When Pennsalt and Olin entered into the joint venture, there were only three companies in the United States which produced sodium chlorate for sale commercially: Hooker, AmPot and Pennsalt. Pennsalt had only one plant. It was on the west coast at Portland, Oregon. Hooker had two plants, both in the east. One was at Niagara Falls, New York, and the other at Columbus, Mississippi. AmPot had two plants—one in the east at Aberdeen, Mississippi, and the other in the west at Henderson, Nevada. The Mississippi installations of AmPot and Hooker were both in the southeastern market.

The southeastern market was the one in which there was the heaviest concentration of sodium chlorate buyers.[7] Of

7. Out of 82,094.70 tons shipped in 1960 within the United States, 47,035.76, or 57.3%, went to the southeastern market. Of the remainder, 18,152.72 tons, or 22.-

the buyers, the pulp and paper mills were far and away the largest.[8] Plants having almost half of the national sodium chlorate productive capacity were also located in the southeast.[9]

After the southeast, the largest concentration of buyers and the largest productive capacity were in the 11 states west of the Rocky Mountains.[10]

In 1960, therefore, the two most important markets in the United States, both from the standpoint of consumption and production, were first, the southeastern market, and second, the western market. Of foremost importance in determining whether there was a nationwide relevant market is the question whether western shippers could compete effectively in the southeast, and southeastern producers could compete effectively in the 11 western states. Unless they could, there was no relevant national market.

Normally of vital importance to competitive effectiveness are quality, price and service. So far as appears, neither AmPot, Hooker or Pennsalt enjoyed any advantage over the other in the quality of its product. From the standpoint of both price and service, Pennsalt was at a decided disadvantage, as against AmPot and Hooker, in supplying buyers in the southeast.

Pennsalt's price disadvantage resulted from the cost of transportation which it had to bear. To be competitive in the southeast, Pennsalt was faced with the necessity of absorbing the difference between the freight from its Portland plant and the buyer, and the freight between the buyer and the closest southeastern supplier. The freight disadvantage to AmPot in shipping a ton of sodium chlorate into the southeastern market from Henderson, Nevada as against shipping it from Aberdeen, Mississippi was approximately $25 to $30 a ton. This represented about 15% of the delivered price of $163 a ton. The freight disadvantage to Pennsalt was even greater.

■ A competitive price disadvantage arising from transportation costs is an important factor in determining the scope of a relevant market. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), reh. den. 334 U.S. 862, 68 S.Ct. 1525, 92 L.Ed. 1781 (1948); American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387, 398 (S.D.N.Y.1957), aff'd 259 F.2d 524 (2d Cir. 1958); Erie Sand & Gravel Co. v. F. T. C., 291 F.2d 279, 281–282 (3d Cir. 1961). The record fails to suggest that Pennsalt was in a position to surmount or equalize its freight disadvantage because of lower operational costs, or otherwise.

Remoteness from southeastern buyers also placed Pennsalt at a service disadvantage. To pulp and paper manufacturers prompt delivery is a matter of importance. Delivery time for a shipment from Mississippi to the southeastern market is normally two to four days. Shipments from the northwest take ten to fourteen days. The chances of shipping delays increase as the distance between supplier and customer becomes greater. When Olin was acting as selling agent for Pennsalt under the Decem-

---

2%, were shipped west of the Rockies, and the balance of 16,906.22, or 20.5%, went elsewhere.

8. In 1960, of the 47,035.76 tons of sodium chlorate shipped to southeastern buyers, 39,562.83 tons, or 84.1%, were purchased by the pulp and paper industry. The amount so purchased represented 75.5% of the 52,415.03 tons purchased by all of the pulp and paper mills in the United States.

9. As against the 1960 national productive capacity of 107,434 tons, plants having

a tonnage capacity of 47,000 tons were in the southeast, viz., Hooker at Columbus, Mississippi with 32,000 tons, and AmPot at Aberdeen, Mississippi with 15,000 tons. The capacity of the latter was increased to 22,500 in December 1960.

10. See footnote 7 as to buyer concentration. The productive capacity of the Pennsalt plant at Portland was 15,434 tons and that of AmPot at Henderson was 27,000 tons, making a total of 42,434 tons, as against the total national productive capacity of 107,434 tons.

ber 1957 contract, Olin encountered buyer resistance because Pennsalt's production was located at a substantial distance from the market.

In addition, a buyer wants an assured source of supply. A remote seller such as Pennsalt who is called upon to absorb substantial freight costs cannot be viewed as a stable source of supply. It will, in all likelihood, favor buyers in its own vicinity whenever the supply situation becomes tight. This would appear to be particularly true in the case of Pennsalt since for many years both the bulk price and the drum price of sodium chlorate has been higher west of the Rockies than east of the Rockies. This price differential of about 15%, coupled with the freight equalization with which Pennsalt is burdened, would, in times of short supply, naturally cause Pennsalt to favor west coast purchasers at the expense of buyers in the southeast. The proximity of productive facilities in terms of the availability to a buyer of service and supply is also important in the delineation of a relevant market. Crown Zellerbach Corp. v. F. T. C., 296 F.2d 800, 817 (9th Cir. 1961), cert. den. 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962). See also Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. pp. 331–333, 81 S.Ct. pp. 630–631.

The disadvantages inherent in the distance of Pennsalt's plant from southeastern buyers prevented Pennsalt from effectively competing against suppliers with plants in that area. To Pennsalt, the southeast was not a "natural locus of distribution". American Crystal Sugar Co. v. Cuban-American Sugar Co., supra, 152 F.Supp. p. 398. Pennsalt's proximity to pulp and paper manufacturers in the northwest made that market the natural distributional area for it. In 1960 Pennsalt supplied 100% of the sodium chlorate bought by pulp and paper manufacturers in the northwest.

The Government answers that Pennsalt's competitive handicaps are theoretical only. It argues that despite Pennsalt's natural, freight, or other burdens, it has hurdled all obstacles, and by its actual shipments across country has demonstrated its ability to effectively compete in the southeast. Theory, the Government says, is of little consequence as against the facts. United States v. Bethlehem Steel Corp., supra, 168 F.Supp. pp. 592, 599.

The Government points out that in 1960 Pennsalt shipped across country 4,877 tons of sodium chlorate, or 32% of its total shipments of 15,362 tons. The key factor which enabled Pennsalt to do this is said to have been the substantial excess of eastern demand over production.

Despite the Government's assertion of a substantial imbalance between supply and demand in the "eastern" market, none existed in the southeast. The total shipments of sodium chlorate to the southeast during 1960 was 47,035.76 tons. The total capacity of the southeastern plants was 47,000 tons; Hooker at Columbus, 32,000 tons; AmPot at Aberdeen, 15,000 tons. In 1960 the southeastern market was not a deficit area.[11]

In 1960 Pennsalt shipped into the southeastern market 4,186 tons, or 27% of its total shipments of 15,195 tons. Of these shipments, 3,203 tons were sold by Olin as agent for Pennsalt under their sales contract of December 1957.[12] Olin had long-standing contacts with many buyers as a result of other chemicals sold to them and enjoyed a unique good will because of having made the Mathieson process available without charge. The arrangement between Pennsalt and Olin was only temporary, and Pennsalt was losing $80,000 a year on the sales which Olin was making. Pennsalt's shipments of 3,203 tons in fulfillment of sales generated by Olin were of a special non-

11. The supply situation was to be further improved in December 1960 when Am-Pot's capacity at Aberdeen was increased by 7,500 tons. This brought the total capacity of AmPot and Hooker in Mississippi up to 54,500 tons.

12. This is discussed in detail at p. 1108 et seq. of this opinion.

recurring kind. They cannot be considered as indicative of Pennsalt's effectiveness as an independent competitor in the southeast.

Apart from the 3,203 tons sold by Olin, Pennsalt shipped only 983 tons of sodium chlorate into the southeastern market.[13] The total shipments of sodium chlorate into the southeastern market in 1960 for all purposes was 47,035.76 tons. Of this, Hooker shipped 23,263.52 tons, or 49%, and AmPot shipped 19,586.24 tons, or 42%. Pennsalt's shipments of 3,203 tons under the sales agreement with Olin were 7%. The shipments which Pennsalt made in satisfaction of its own sales were 2%.

Furthermore, of the 983 tons shipped to the southeast by Pennsalt, independently of Olin, only 458.40 tons went to pulp and paper manufacturers.[14] This was 1% of the total tonnage of 39,562.83 which was shipped to the southeastern pulp and paper manufacturers in 1960. It compares with 18,127.71 tons, or 46%, shipped by Hooker, 17,556.72 tons, or 44%, shipped by Ampot, and 3,420 tons, or 9%, sold by Olin for Pennsalt.

In 1960 shipments of 7,472.93 tons of sodium chlorate were made to buyers, other than pulp and paper mills, in the southeast. The sales agreement which Pennsalt had with Olin left Pennsalt free to compete for this business. It succeeded in obtaining 525 tons, or about 7%.

Both in theory and in fact Pennsalt was not an effective competitor in the southeast.

In furtherance of its national market claim, the Government points out that in 1960 Ampot shipped across country 8,808 tons of sodium chlorate from its Henderson, Nevada plant, or 64% of its total shipments of 13,767.82 tons from that plant. Of these "across country" shipments, 7,237 tons, or 52.6%, of the shipments from Henderson went into the southeast. But at the time Ampot's Aberdeen plant, with a productive capacity of 15,000 tons, was unable to take care of the total tonnage of 19,586.24 tons which Ampot supplied to southeastern buyers. In contrast, Ampot's Henderson capacity of 27,000 tons far exceeded the 9,586.55 tons demanded by AmPot's customers in areas outside the southeast. This dual imbalance between supply and demand at Ampot's two plants was intracorporate and temporary. It was rectified in December 1960 when AmPat increased its capacity at Aberdeen by 7,500 tons. It was AmPot's intention to satisfy the requirements of its customers in the southeast out of this increased capacity at Aberdeen and not from Henderson.[15] So that such shipments as AmPot made into the southeast from Henderson are not significant in determining whether a western shipper can effectively compete for business in the southeast.

So far as shipments from the southeast to the west are concerned, in 1960 Ampot made no shipment from its Aberdeen plant to buyers west of the Rockies.

Hooker's situation with respect to east-west shipments was different. Al-

13. Of this amount, 363.5 tons went to Buckeye Cellulose Company, a subsidiary of Proctor & Gamble. Since Buckeye owned its own freight cars which were used to transport the sodium chlorate from Portland to Florida, the railroad made an allowance to Buckeye covering the cost of returning the cars to the point of origin. This circumstance, which gave Buckeye a unique advantage in receiving shipments from the west coast, coupled with the fact that Proctor & Gamble was an important customer for other products of Pennsalt, are the reasons why Pennsalt had the Buckeye account.

14. This is 94.9 tons more than the 363.5 tons that went to Buckeye, the Pennsalt reserved account. It represents shipments to two other southeastern pulp and paper mills.

15. It could hardly be expected to do otherwise since the freight disadvantage in shipping from Henderson to the southeast, as against shipping from Aberdeen, was $25 to $30 a ton, or something in excess of 15% of the bulk sales price of $163 in the southeastern market.

though in 1960 Hooker made no shipments to the west coast from its Niagara Falls plant, it shipped 2,708.35 tons from its Columbus plant to customers west of the Rockies. This was 14.9% of the 18,152.72 tons shipped into the area. It compares with 10,485 tons, or 57.8% shipped by Pennsalt from Portland and 4,959.37 tons, or 27.3% shipped by AmPot from Henderson. The 2,708.-35 tons which Hooker shipped to buyers in the west represented 7% of the 37,-559.91 tons which Hooker shipped from both Niagara Falls and Columbus.

At the time Hooker had excess productive capacity of magnitude. As against a total of 50,000 tons (Niagara Falls 18,-000 tons, Columbus 32,000 tons) it shipped to all markets east of the Rockies only 34,851.6 tons, or 70% of its available capacity. Tonnage shipped from the Columbus plant to all markets east of the Rockies amounted to 26,478.23 tons leaving that plant with 5,521.77 tons at Columbus, or 20.9% of the plant capacity, to be disposed of. It was out of this excess that the 2,708.35 tons were supplied to the west. Of this, 1,920.65, or about ⅔, went to a single buyer, U. S. Borax Co., for herbicidal use.

The total shipments of AmPot and Hooker from their eastern facilities were 52,964.88 tons; viz.:

| | |
|---|---|
| Hooker shipments Columbus and Niagara Falls | 37,559.91 |
| AmPot shipments Aberdeen | 15,404.97 |
| Total | 52,964.88 |

Of this, the 2,708 tons which Hooker shipped to the west coast from its excess capacity at its Columbus plant, amounted to 5%. The east-west shipments by Hooker in 1960 were undoubtedly the re-sult of a desire to keep its plants operating as close to capacity as possible when eastern buyers were not available.

Here, there is no indication that an imbalance between supply and demand, either nationally or locally, had been the industry norm over a period of years or that it will be in the future. This circumstance makes irrelevant United States v. Bethlehem Steel Company, supra, which held that in determining the relevance of a market, freight costs were only a marginal factor when an industry-wide imbalance between supply and demand had persisted through the years and reflected an industry pattern (168 F. Supp. pp. 598–599).

In sum, neither Pennsalt nor AmPot could compete effectively from their western plants for business in the southeast where the highest concentration of buyers was located. Nor could AmPot or Hooker, the two companies having eastern facilities, effectively compete for business on the west coast. In each case the competitive limitation was due to market remoteness. There was no national market for sodium chlorate in 1960 relevant to an ascertainment of the competitive impact of the joint venture.

### The Effect of the Joint Venture on Competition in Sodium Chlorate

■ On the competition issue, the initial position of the Government is novel and far reaching. It contends that Pennsalt and Olin *could* have competed with each other since each was as financially able and otherwise competent to compete on an individual basis as other sodium manufacturers which were doing so. In these circumstances, it is said that the antitrust laws required Pennsalt and Olin to compete individually or to stay out of business.[16] Their attempt to com-

16. The Post Trial Brief of the Government states (p. 1):

"This case involves a joint venture between two companies that could have competed."

The same brief states at p. 2:
"The fundamental issue posed by the trial of this case is whether the anti-trust laws condemn the entry of competitors into business together when, except for subjective preferences based on profitability and risk, each could have done so alone."

The Government's reply brief states (p. 30):
"When competitors and potential competitors have comparable resources and

pete jointly, through the medium of Penn-Olin, because of a desire for greater profitability and risk limitation, is therefore said to be violative of Section 7.

The Government thus lays aside as immaterial any consideration of whether, but for Penn-Olin, Pennsalt and Olin *would* have entered the market as individual competitors, or what the competitive effect of Penn-Olin may be in the light of relevant economic factors. Instead, it would substitute a conclusive presumption that *any* combination specified in Section 7 between companies having the overall capability to go into business alone has a pernicious effect on competition and lacks any redeeming virtue; it would make *any* such combination illegal *per se*. No precedent supports the Government's position and its lack of logic condemns it. Compare United States v. E. I. DuPont de Nemours & Co., 118 F.Supp. 41, 219-220 (D.Del.1953), aff'd 351 U.S. 377, 76 S.Ct. 994, 100 L. Ed. 1264 (1956) which held that under the Sherman Act it is not illegal *per se* for actual competitors to combine by means of a joint venture, but that a determination of the unreasonableness of the restraint is essential to its illegality.

The real issue is whether, based upon relevant economic factors, the formation of Penn-Olin has resulted, or as a reasonable probability will result, in a substantial lessening of competition or tend to create a monopoly in sodium chlorate in the southeastern part of the United States.

Prior to the joint venture, Olin had never produced sodium chlorate for sale in any market area or during any period of time. Nor had it ever sold sodium chlorate except for the limited time when it acted as sales agent for Pennsalt under the December 1957 contract. It had never purchased for its own use sodium chlorate from Pennsalt. On the other hand, Pennsalt had been manufacturing and selling sodium chlorate since 1941 from its plant at Portland, Oregon. Its shipments into the southeastern market were competitively not substantial.

The creation of Penn-Olin did not represent a combination of companies which were competing in the manufacture and sale of sodium chlorate in the southeastern market or elsewhere. Nor did it represent a combination of companies standing in the relationship of supplier and customer in the southeastern market or elsewhere.[17] It was neither a vertical combination or a horizontal combination.[18] Contrasted with these anticompetitive relationships which are frequently the subject of antitrust condemnation, the arrangement between Olin and Pennsalt was *sui generis*.

When Section 7 was amended in 1950 Congress was apprehensive of the rising tide of economic concentration as a dynamic force which it believed posed serious threats to the free enterprise system. One of the basic purposes of the 1950 amendment was to arrest in their incipiency combinations resulting in the concentration of power which would probably have the effect of jeopardizing to a substantial extent competition. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 315, 317, 82 S.Ct. pp. 1518, 1519.

face similar hurdles, the anti-trust laws require that they meet these challenges on individual terms or not at all. They may compete or not as they please. But the option to compete or combine is forbidden."

17. Olin purchased sodium chlorate to use as a raw material in manufacturing sodium chlorite at its Niagara Falls plant. This sodium chlorate was purchased from Hooker's neighboring Niagara Falls plant. Pennsalt from its Portland plant could not have competed successfully with Hooker for Olin's business.

18. When the arrangement is between companies standing in a supplier-customer relationship it is characterized as vertical; when between companies performing similar functions in the production or sale of comparable goods or services, it is said to be horizontal. Brown Shoe Co. v. United States, supra, 370 U.S. pp. 323, 334, 82 S.Ct. pp. 1522, 1523.

The creation of Penn-Olin was not the typical case of one competitor menacing an industry by increasing its competitive power through the acquisition of another competitor. Penn-Olin was not the instrumentality through which two competitors sought to enlarge their economic power. Pennsalt and Olin were not competitors. Pennsalt was a company which had experience in the manufacture and sale of sodium chlorate in the far west. Olin was a company which had contacts of value with prospective customers in the southeast. Penn-Olin was the means by which the strength of the two companies was joined—not for the purpose of further pre-empting a market which they already occupied, but to break into a market to challenge the supremacy of two companies which were dominating it.

Those companies were Hooker and AmPot. In 1960 Hooker supplied 49.5% and Ampot furnished 41.6% of the requirements of buyers in the southeast. Pennsalt's share, independent of the quantity sold by Olin as its sales agent, was 2.1%, and including Olin's sales, was 8.9%.

As for productive capacity, Pennsalt nationally was the smallest of the three companies. In 1960, Hooker had 50,000 tons, or 46.5%, AmPot 42,000 tons, or 39.1%, and Pennsalt 15,434 tons, or 14.4%. In the southeastern market, Hooker's plant at Columbus, Mississippi had a capacity of 32,000 tons, or 68%, of the total capacity in that market, and AmPot's 15,000 ton plant at Aberdeen possessed the remaining 32%. Pennsalt had no plant in the southeast.

When Penn-Olin goes on stream it can reasonably be expected to have an immediate effect on competitive conditions which theretofore existed. Thereafter, it is not to be supposed that Pennsalt will continue to make shipments to the southeast. What it otherwise might have supplied from Portland will be shipped by Penn-Olin from Calvert City. As an independent competitor in the southeast, Pennsalt will probably be finished. But the elimination of Pennsalt does not mean that competition will be substantially lessened within the intendment of Congress. Whether a combination described in Section 7 will have the anticompetitive effect forbidden by the Act, cannot be ascertained merely by looking at its effect upon the competitive activities of the combining companies. The critical determination is whether the combination substantially lessens competition *generally* in an economically significant market. Brown Shoe Co. v. United States, supra, 370 U.S. p. 335, 82 S.Ct. p. 1529. Pennsalt occupied only a relatively insignificant competitive position in the southeast. As will be later shown, the competitive benefits which derive from Penn-Olin entering the market far exceed any competitive loss resulting from Pennsalt's probable elimination.

The Government asserts that another immediate effect of the joint venture will be to make Olin a captive buyer of sodium chlorate from Penn-Olin and to deprive other suppliers of obtaining any of Olin's business. For some years Olin has been buying sodium chlorate at its Niagara Falls plant to use in the manufacture of sodium chlorite. Its requirements have been supplied by Hooker from its Niagara Falls plant.[19] While Olin's 50% ownership of Penn-Olin does not legally deprive Olin of the right to continue to buy from Hooker or anyone else, self-

---

19. Hooker's shipments to Olin have been as follows:

| Year | Tons |
| --- | --- |
| 1957 | 1,300 |
| 1958 | 1,100 |
| 1959 | 1,300 |
| 1960 | 1,350 |
| 1961 (6 mos.) | 560 |

Larger quantities of sodium chlorate sold in the United States, but produced outside of the United States, from 1958 to 1960, have been stipulated not to be substantial.

interest might lead Olin to buy from Penn-Olin. But it cannot be said that as a matter of reasonable probability Olin will do so. Whether purchasing from Penn-Olin will be to Olin's *net* advantage depends upon a balancing of the advantage which will accrue to Olin as a stockholder of Penn-Olin as against freight and service disadvantages inherent in shipments from Calvert City instead of a "next door" supplier. The record gives no indication how Olin will evaluate these conflicting considerations. In any event, however disadvantaged other suppliers may be in seeking Olin's business, it will not diminish competition for business in the southeast.

The primary attack of the Government is not directed to the alleged adverse affect of the joint venture on existing competition, but against its effect upon various aspects of potential competition.

The Government argues that the financial resources of defendants, as compared with those of Hooker and AmPot, are so great as to give Penn-Olin competitive advantages that will ultimately lead to market domination by it. This contention is based largely upon the proposition that the defendants, because of their size, will be able to use their combined buying power as a basis for making reciprocal arrangements with vendors who are sodium chlorate buyers, which will give Penn-Olin an undue sales advantage over its competitors.

Pennsalt is an acknowledged practitioner of reciprocity and uses purchasing-marketing coordination to further its sales efforts. Whether this is also the policy of Olin is more questionable. The record does not disclose whether Hooker and AmPot have or will endeavor to capitalize on their buying power to further their sales position. But in any event, whatever advantage Penn-Olin might be able to obtain through reciprocal arrangements because of the combined size of the defendants scarcely warrants the conclusion that as a matter of reasonable probability Penn-Olin will ultimately dominate the sodium chlorate market.

AmPot and Hooker are both multi-million dollar companies with established positions in the southeastern market. Neither is apt to be at a competitive disadvantage simply because of defendants' size. Thus far, neither has shown any disposition to lessen its competitive efforts because of confrontation by Penn-Olin. On the contrary, both have attempted to make themselves more formidable as business rivals. Prior to Penn-Olin, the capacity of the Hooker plant at Columbus was 29,150 tons. Since Penn-Olin, the capacity has been increased to 32,000 tons. After Penn-Olin's plan to build a plant at Calvert City became known, Hooker employed a new salesman who was a specialist in pulp and paper sales, and installed a pulp and paper research laboratory for its customers. It offered its customers five-year contracts guaranteeing them a firm price during the contract period. It also proposed to increase its selling efforts generally. These actions were due in part at least to the increased competition expected from Penn-Olin.

Similarly with AmPot. After AmPot learned of the joint venture it proceeded to expand the capacity of its Aberdeen plant from 12,000 to 22,500 tons, and began to offer five-year contracts to its customers guaranteeing them a fixed price for five years.

The determination in 1961 of PPG to enter the southeastern market makes the likelihood of market domination by Penn-Olin even more remote. PPG plans to construct a sodium chlorate plant at Lake Charles, Louisiana with an intended ultimate capacity of 15,000 tons. It is a company which in 1960 had assets of $625,000,000 and sales of $628,000,000. From the standpoint of size it is capable of competing effectively with Penn-Olin or anyone else. The Government's forecast that Penn-Olin will uproot Hooker and AmPot from their entrenched positions and ultimately become the dominant factor in the southeast is based on conjecture and nothing more.

The Government further asserts that the size of the Calvert City plant will

probably deter other companies from entering the southeastern market, when otherwise they might have done so. The Government points out that Penn-Olin's 26,500 ton plant was the largest ever built at one time in the United States, and that previously almost all plants at the outset went in the 2,000–15,000 range. By the time Penn-Olin was ready to build, the demand for sodium chlorate in the southeast had increased dramatically. The size of its plant was not out of line with competitors' plants then in existence or imminently in prospect. The *in terrorem* significance which the Government attributes to the disparity between the size of Penn-Olin's plant and those initially constructed by others under conditions which then prevailed, is not warranted.

Such evidence as there is should allay any fear that Penn-Olin, either because of the size of its plant or the combined resources of the defendants, will have any exclusionary effect upon potential entrants having antitrust relevance. When PPG announced its decision to build at Lake Charles, Louisiana, it knew of Penn-Olin's intention to build at Calvert City. Prospective competition from Penn-Olin did not cause PPG to alter its plans. It is true that PPG made its decision after the present suit was begun. It cannot be supposed, however, that PPG's decision was made upon the basis of so hazardous a judgment that Penn-Olin would be eliminated or rendered substantially less effective competitively by a judgment in the Government's favor. It is more reasonable to conclude that PPG acted because an appraisal of market conditions convinced it that regardless of the outcome of the present litigation, additional sodium chlorate capacity was needed in the southeast and that after its plant was built, it would be able to obtain a fair share of the market for itself.

The Government points out that "rumor" indicated that the idea of building in the southeast occurred to the Solvay Division of Allied Chemical Corporation, Wyandotte Chemicals, and Virginia Smelting Company, but that none had done so. Penn-Olin is said to be the reason. This rumor was never substantiated. Each of the rumored potential competitors was interviewed by agents of the F.B.I. at the direction and under the supervision of counsel for the Government. Yet the Government called no witness from any of the companies. Its failure to do so at least suggests that it could find no one to corroborate its claim.

It is true that prior to the joint venture Pennsalt was of the opinion that the southeastern market could handle only one more significant producer; and both Pennsalt and Olin believed that by a prompt announcement on February 15, 1960 of the formation of Penn-Olin and its plans, the market might be preempted from other potential competitors.[20] But this evidence will not support the conclusion that one or more other companies were probably deterred by Penn-Olin from going into business in the southeast, since there is no proof that any newcomer other than PPG was considering doing so and PPG decided to enter the market after Penn-Olin had been announced. The absence of entry by others, in itself, is not too meaningful, since even before the formation of Penn-Olin was announced there had been no newcomers in the sodium chlorate industry for a decade. Furthermore, whether the unidentified companies which the Government asserts were probably excluded from the market would have been as effective business rivals as Penn-Olin is to be doubted. The combined experience of Pennsalt and Olin in sodium chlorate far exceeded that of any other potential market entrant. AmPot and Hooker had a virtual monopoly in the southeast and a formidable opponent was required if substantial inroads upon their entrenched positions were to be made.

20. Evidence of the intention of parties to a combination is an aid in predicting their probable future conduct and the probable effect of the combination. See Brown Shoe Co. v. United States, supra, 370 U.S. p. 329, n. 48, 82 S.Ct. p. 1526.

It cannot be held that as of the date of trial Penn-Olin probably deterred others from entering the field. What Penn-Olin's effect in the future may be upon would-be entrants can only be a matter of conjecture. Obviously, the number and strength of companies already in a market will have a bearing upon another's decision to enter it. But it is only one of a myriad of other factors which will control the decision. The imponderables are too great to hazard a forecast as to Penn-Olin's future deterrent effect, even on the basis of probabilities, which will have validity.

The Government makes the further argument that if Olin and Pennsalt had not determined to become partners via Penn-Olin, the probabilities are that both would have built a sodium chlorate plant somewhere in the southeast. Penn-Olin, the argument runs, thus prevented Pennsalt, an "actual" competitor, and Olin, a "potential" competitor, from independently competing in the southeast.[21]

The interest which Pennsalt had in building a sodium chlorate plant in the southeast was of long standing. Its 20-year operating experience at Portland had provided it with all requisite manufacturing know-how, and it was aware of the rapidly expanding market in the southeast. As early as 1951 it had cost studies made for a plant at Calvert City, Kentucky. From 1955 on the company gave almost continuous consideration to the establishment of a plant in the southeast. The record contains frequent expressions of optimism by Pennsalt personnel concerning the desirability of southeastern expansion. Yet no decision to proceed was ever arrived at. This was due primarily to the inability of the management to satisfy itself that the plant would be sufficiently profitable to meet the rate of return standard which it had established as a condition for new investments.

Olin's interest in manufacturing and selling sodium chlorate in the southeast for its own account likewise antedated the joint venture by a number of years. It realized that sodium chlorate would soon replace sodium chlorite as a raw material in the Mathieson process, and that the demand for sodium chlorate by pulp and paper mills in the southeast was rapidly expanding. It had extended experience in the technical aspects of bleaching pulp and paper. It possessed valuable contacts with the pulp and paper mills as a result of selling other chemicals to them, and having made available, without charge, the Mathieson process. This combination of circumstances led Olin to actively consider the possibility of building a plant of its own in the southeast. To that end, it had studies made of plant location, power availability, sales potential, manufacturing techniques, construction costs, profitability, and other relevant factors. But Olin, like Pennsalt, never decided to go forward independently with the project. The primary difficulty encountered every time the project was analyzed seemed to be the generally unsatisfactory rate of return.

Paralleling in point of time the studies which Pennsalt and Olin were making concerning the feasibility of building their own plants were several years of sporadic discussions between them relating to the possibility of entering the southeastern market by means of a joint arrangement of some kind. The joint venture agreement was the culmination of these discussions. The possibility of individual entry into the southeastern market had not been completely rejected

21. An additional argument is that the practical effect of Penn-Olin was to bring about an allocation of markets between Olin and Pennsalt. Thus, it is said that the joint interest of the companies in Penn-Olin will necessarily prevent Pennsalt from competing from its Portland plant for business in the southeast, and has foreclosed Olin from competing for west coast business from the plant which, but for Penn-Olin, it would have built in the southeast. This argument assumes a national market of competitive effectiveness. The absence of such a market invalidates the argument.

by either Pennsalt or Olin before they decided upon the joint venture.[22]

At the time when the joint venture was agreed upon Pennsalt and Olin each had an extensive background in sodium chlorate. Pennsalt had years of experience in manufacturing and selling it. Although Olin had never been a commercial manufacturer, it possessed a substantially developed manufacturing technique of its own, and also had available to it a process developed by Vickers-Krebs with whom it had been negotiating to construct a plant. Olin had contacts among the southeastern pulp and paper mills which Pennsalt lacked, but Pennsalt's own estimates indicate that in a reasonable time it would develop adequate business to support a plant if it decided to build. A suitable location for a plant was available to each company—Calvert City, Kentucky for Pennsalt, and the TVA area around Chattanooga, Tennessee for Olin. The financing required would not have been a problem for either company. In short, when the joint venture agreement was signed, Pennsalt and Olin each possessed the resources and general capability needed to build its own plant in the southeast and to compete with Hooker and Ampot in that market. Each could have done so if it had wished. While neither company was able to satisfy itself with the rate of return potential of an individually owned plant, the forecasts of each company indicated that a plant could be operated with profit.[23] From the standpoint of profitability, however, Pennsalt and Olin both believed that they could make more money on their investment and that the risks would be less if their business were

22. Osborne, the President of Penn-Olin, testified that Olin's decision to enter the joint venture was made without determining that Olin could not or would not be an independent competitor. He testified that that question "never reached the point of final decision."

Pennsalt asserts that on December 5, 1957 its management made its final decision that it should not build a plant of its own and that this decision was never reconsidered or changed. The view that the December 5, 1957 decision was final is rejected. The record is replete with evidence that after December 5, 1957 Pennsalt continued to manifest an interest in an independent sodium chlorate venture, although this was primarily in the posture of a combined sodium chlorate-ammonium perchlorate plant. The consideration which was given to the ammonium perchlorate aspect of the venture was basically to support the manufacture of sodium chlorate. Ammonium perchlorate was viewed as a "sweetener" to justify the investment economically, since ammonium perchlorate, as compared with sodium chlorate, yielded a relatively high rate of return on investment.

In December 1958 the management of Pennsalt agreed to launch a full-scale effort to determine the feasibility of a sodium chlorate-ammonium perchlorate plant. This effort was not made because in January 1959 Pennsalt resumed joint venture discussions with Olin. The January 1959 minutes of the Appropriation Committee of Pennsalt indicate that if Olin was not desirous of proceeding with the joint venture, data on doing the project alone should be resubmitted to the committee. As late as December 30, 1959, Land, General Manager, Industrial Chemicals Division East, was still of the view that no final decision had been made whether Pennsalt would build its own plant.

23. For instance, the so-called Whither Report of the Chemical Division of Olin dated April 10, 1959 disclosed that if Olin built a 15,000 ton sodium chlorate plant at Mackintosh, Alabama, it could be expected to show a profit after taxes equal to 11% on the gross investment of $4,100,000. A revision of the Report in October 1959 revealed that if Olin constructed a combined sodium chlorate-chlorine-caustic plant at Chattanooga, Tennessee, the investment of $3,590,000 attributed to the 15,000 ton sodium chlorate facility would yield an after-tax profit of 13.1%.

A study made by Pennsalt in 1959 for a combined sodium chlorate-ammonium perchlorate plant at Calvert City, Kentucky showed that the $6,961,300 investment cost assigned to the 25,000 ton sodium chlorate phase would yield a 15.9% after-tax return.

Although both companies made a number of studies of the potential profit to be derived from a sodium chlorate plant and the anticipated yield on investment was not uniform, each of the studies forecast a profit.

carried on through a jointly owned plant rather than by means of plants individually owned.

■ The fact that Olin and Pennsalt each had the capability of building a plant and competing individually is of no controlling significance. It is important only as a factor in determining whether as a matter of probability *both* companies would have entered the market as individual competitors if Penn-Olin had not been formed.[24] Only in this event would potential competition between the two companies have been foreclosed by the joint venture. Whether or not as a matter of probability Pennsalt or Olin would have constructed a plant of its own in the absence of Penn-Olin, need not be decided, for the reasons hereinafter stated.

No evidence exists which will support a finding that if Penn-Olin had not been created Pennsalt and Olin would have *simultaneously* determined to build their own plants. Not only the inherent improbability of this occurring, but the protracted study which each company gave to the problem without arriving at an affirmative decision, negates such a likelihood. So that the best possible postulate on which the Government's case can be based is that one company would have decided to build while the other continued to ponder.

The decision by one company to build, however, might have had a bearing upon the decision of the other. The considerations which might induce one company to build its own plant when Hooker and AmPot were the only competitors would not necessarily be the same if a third competitor were about to enter the market. Pennsalt and Olin were each hesitant to build a plant of its own in a market occupied by two competitors. Whether the imminent presence of a third competitor might have made the prospect more or less appealing cannot be foretold. Neither company had ever faced the problem. The record affords no clue as to what action might have been taken if the problem had arisen. It is therefore impossible to conclude that as a matter of reasonable probability *both* Pennsalt and Olin would have built plants in the southeast if Penn-Olin had not been created.

The most favorable assumption that can be made from the Government's standpoint is that either Pennsalt or Olin—but not both—would have entered the southeastern market as an independent competitor if the two companies had not agreed to consolidate their efforts through Penn-Olin. Upon this assumption the effect of Penn-Olin was to eliminate Pennsalt or Olin, as the case may be, as a competitor. But even this hypothesized situation affords no basis for concluding that Penn-Olin had the effect of substantially lessening competition. Whether or not it did depends upon the competitive impact which Penn-Olin will have as against that which might have resulted if Pennsalt or Olin had been an individual market entrant.

■ The Government argues that any such comparison is irrelevant and that a determination that Olin (or Pennsalt) would have built its own plant but for Penn-Olin automatically condemns the joint venture.[25] Such an interpreta-

---

24. Section 7 is not concerned with possibilities of competition being substantially lessened; its aim is directed against combinations that probably will have that result. Brown Shoe Co. v. United States, supra, 370 U.S. p. 323, 82 S.Ct. p. 1522.

25. The Transcript of Argument reads at pp. 125–126:

"THE COURT: Let me ask you: If I should come to the conclusion that as a matter of reasonable probability, absent the joint venture, Olin would have constructed a factory and sold its prod-

ucts in the southeast, if I should come to that conclusion, does the Government contend that from that the Government must * * * win?"
"MR. FREED: Yes.

"THE COURT: Let me ask you: Isn't there a further question as to whether or not the construction of a plant by Olin, sales of products by Olin in the southeast, would have produced a more competitive situation than did the joint venture?

tion would cut the heart out of Section 7. The Section denounces a substantial "lessening" of competition. "Lessening" is a word of comparison. It demands that the competitive situation which the challenged transaction has brought about be compared with that which otherwise would have existed. Under the Sherman Act competitive conditions before and after a trade restraint must be examined to determine its reasonableness. Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). A similar comparison is no less essential in determining whether a transaction otherwise within the reach of the Clayton Act will affect competition adversely. If Penn-Olin had the effect of keeping Pennsalt or Olin out of the southeastern market, it runs afoul of Section 7 only if competition generally in the southeast will probably be substantially less under the joint entry by Pennsalt and Olin *via* Penn-Olin than it would have been if there had been individual entry by either Olin or Pennsalt.

In the classical horizontal combination case an appraisal of the competitive potential of each of the combining competitors can be made upon the basis of its prior record. Here there are no past records of Pennsalt or Olin that can be drawn upon to show their individual competitive effectiveness in the southeast, except those which pertain to the 1957–1960 period when Olin was acting temporarily as Pennsalt's sales agent. They establish a market penetration by Pennsalt and Olin which was insignificant compared with that of Hooker and AmPot. What the competitive impact of Pennsalt or Olin might have been if either had owned its own plant in the southeast cannot be determined from the record. Nor does the record disclose the competitive effectiveness, in terms of percent of business obtained or otherwise, which Penn-Olin has made since it began business.

Solely as a matter of theory, however, no reason exists to suppose that Penn-Olin will be a less effective competitor than Pennsalt or Olin would have been. The contrary conclusion is the more reasonable. Penn-Olin should be able to bring to the southeast the aggregate contributions of both companies. After all, Penn-Olin is owned and managed by both Olin and Pennsalt. Whatever manufacturing or marketing techniques, new product usages or other advantageous operational procedures are known to Olin or Pennsalt can be expected to be brought to the attention of Penn-Olin and utilized by it. Neither Pennsalt or Olin has any reason to suppress information which will be of advantage to Penn-Olin. All three companies are in business to make money, and competitive effectiveness is essential to the achievement of this objective.

Before trial, the Government interviewed and corresponded with a number of chemical companies and sodium chlorate producers. In spite of this, no witness was called to testify that the vigor of competition in the sale of sodium chlorate had been, or is likely to be, lessened by Penn-Olin. Nor did the plaintiff introduce any testimony from purchasers of sodium chlorate who complained of any lessening of competition in the industry. Dirkson, Eastern General Sales Manager of AmPot, who called by the Government, testified that there had been no lessening in competition

"MR. FREED: No, Your Honor, that would not be a legitimate question. It is not for the Government and it is not for the courts to weigh the advantages of combinations of competitors and what they give to the economy, and what individual companies give to the economy. * * * "
In arguing that competition created by the joint venture is irrelevant, the Government cites United States v. Minnesota Mining & Manufacturing Co., 92 F.Supp. 947 (D.Mass.1950) as an "important precedent". If the decision is susceptible of the interpretation which the Government gives it, it is inconsistent with the views herein expressed. United States v. Bethlehem Steel Corp., supra, 168 F.Supp. pp. 615–618, the other case relied upon by the Government, is clearly inapposite.

since the establishment of Penn-Olin and that he knew of no facts likely to lead to a lessening in the future.

 It is not every lessening of competition which is forbidden by Section 7. The lessening of competition becomes a matter of legislative concern only if it is reduced to a substantial degree, that is to say to such an extent as will injuriously affect the public. International Shoe Co. v. F. T. C., 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431 (1930).

Prior to Penn-Olin building its plant at Calvert City, Kentucky, Hooker and AmPot had virtually a monopoly in the southeast. With Penn-Olin will be three competitors; and when the PPG plant at Lake Charles goes on stream, there will be four. Each of the newcomers is a sizeable company and should be able to give a good account of itself. Actual and in-prospect production in the southeast will have more than doubled since the joint venture was entered into, as shown by the following tabulation:

| Company and Plant Location | Capacity in Tons | |
| --- | --- | --- |
| | 1959 | Projected 1962 |
| Hooker | 29,150 | 32,000 |
| Columbus, Mississippi | | |
| AmPot | 12,000 | 22,500 |
| Aberdeen, Mississippi | | |
| Penn-Olin | | 26,500 |
| Calvert City, Kentucky | | |
| PPG | | 15,000[26] |
| Lake Charles, Louisiana | | |
| Total | 41,150 | 96,000 |

The advent of Penn-Olin, and later PPG in the southeastern market, together with the increased production in that market, will in all likelihood increase the competition which theretofore existed and bring to buyers of sodium chlorate and to the public the benefits which normally result therefrom.

Congress, in amending Section 7 of the Clayton Act, recognized that all combinations were not anticompetitive, and that in some instances combinations may have the effect of stimulating competition. Brown Shoe Co. v. United States, supra, 370 U.S., p. 319, 82 S.Ct. p. 1521. The probabilities are that Penn-Olin will have that effect.

The Government makes an additional argument founded upon two agreements between Olin and Pennsalt which antedated the joint venture. One, the sales agreement, was made in December 1957; the other, the so-called production agreement, was made in February 1958. It is asserted that the joint venture consummated and perpetuated the restraints in sodium chlorate imposed by the two earlier agreements which were in themselves illegal. For this reason, the argument goes, even if Penn-Olin might have been lawful as a spontaneous creation, its heritage of restraints under the earlier agreements requires its dissolution. United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L. Ed. 2010 (1947) is cited in support of this proposition.

 As subsequently shown the sales agreement and production agreement were not in and of themselves in derogation of the Sherman Act. Nor, as has been previously shown, was the joint

26. To be achieved gradually on a stepped-up basis.

venture, considered independently of the prior agreements, in violation of Section 7 of the Clayton Act. The fact that the three transactions—the joint venture and the two agreements—each legal when considered independently, occurred sequentially and as a part of the totality of events, cannot make them, in combination, illegal. United States v. Yellow Cab Co., supra, is not at variance with this view.

██ It is the burden of the Government to establish that the joint venture probably will have the effect of substantially lessening competition or that it will tend to create a monopoly in sodium chlorate in the southeastern market. This burden has not been met. The joint venture agreement, in its sodium chlorate aspect, violated neither Section 1 of the Sherman Act or Section 7 of the Clayton Act.

*The Effect of the Joint Venture on Competition in Calcium Hypochlorite*

██ As stated, Pennsalt and Olin are substantial competitors, on a nationwide scale, in calcium hypochlorite, one of the non-chlorate chemicals. Together they had 88.8% of the market in 1959 and 76.6% in 1960. The only other competitor of importance is PPG.

The joint venture letter agreement of February 11, 1960 provides that Penn-Olin will manufacture and market not only sodium chlorate but potassium chlorate and perchlorates as well. This agreement was superseded by the definitive contract of October 17, 1961 which limited the operation of the joint venture to sodium chlorate.[27] The Calvert City plant was constructed to produce sodium chlorate only. So that under its present contract and with its existing physical facilities, Penn-Olin cannot manufacture and sell calcium hypochlorite. It is not important that the breadth of the language of Penn-Olin's charter, frequently found in Delaware charters, authorizes it to do so. The

Government concedes that it knows of no plans of the defendants to expand the Calvert City plant or to produce any product other than sodium chlorate.[28]

The Government asserts that in the operation of Penn-Olin high officials of Pennsalt and Olin who make the price and marketing and other pertinent decisions for their own companies will be interlocked with each other as officers and directors of Penn-Olin, and that the information concerning the chemical business which each brings to Penn-Olin's meetings will relate not only to their joint product, sodium chlorate, but also to non-chlorates, including calcium hypochlorite, in which they compete. Discussions which will ensue between the Pennsalt and Olin representatives in their common effort to make the sodium chlorate business a success, the Government argues, will inevitably lead to discussions of all phases of the non-chlorate business in which they are in competition, since chlorate and non-chlorate price policies, marketing areas, distribution systems and customers coincide or overlap. The Government asserts that in these circumstances it would "defy human nature" for the sodium chlorate partners to maintain an unfaltering zeal to compete in non-chlorates.

No evidence exists of collusion of any type, either actual or threatened, between defendants in the conduct of their non-chlorate operations. A finding of illegality in this area, if it is to be made, must rest upon an inference that a substantially lessening of competition between Pennsalt and Olin in non-chlorates will probably result because of the opportunity which their representatives have to make anticompetitive agreements when they meet in connection with Penn-Olin's affairs. Such an inference is incompatible with the holding in Maple Flooring Mfrs' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.

27. Although this was after suit had been begun on January 6, 1961, Olin had determined internally in 1960 that the joint venture should be restricted to sodium chlorate.

28. Transcript of Argument, p. 44.

Ed. 1093 (1925). There it was argued that a trade association consisting of hardwood flooring manufacturers in actual competition with each other which held meetings for the purpose of discussing and exchanging information about costs, commissions, freight rates, sales prices and other pertinent marketing data, would have the *"necessary tendency"* to unduly restrain competition in violation of Section 1 of the Sherman Act (p. 578, 45 S.Ct. p. 583). The Court held, however, that in the absence of proof that anticompetitive agreements or concerted action had been reached or attempted, there was no basis for inferring that the association meetings would result in a violation of the law (p. 586, 45 S.Ct. p. 586).

■ The probability of competition being substantially lessened by conduct specified in the antitrust statutes need not be established by direct evidence. Inferences that competitive restrictions will probably result are judicially acceptable if supported by adequate evidence. Here the proof shows only an opportunity for illegal activities. That is not enough. To equate opportunity for wrongdoing with likelihood of its occurrence reflects a cynicism toward business behavior which is without warrant. Presumption of probable wrongdoing cannot be a substitute for its proof.

There is no basis for finding that the joint venture and the activities of the parties thereunder probably will substantially lessen competition or tend to create a monopoly in calcium hypochlorite in violation of Section 1 of the Sherman Act or Section 7 of the Clayton Act.

## THE ASSERTED ILLEGALITY OF SALES AND PRODUCTION AGREEMENTS

■ The Government challenges two agreements entered into by Olin and Pennsalt in December 1957 and February 1958, referred to, respectively, as the "sales" agreement and the "production" agreement. The Government contends that these agreements, in and of themselves and without reference to the joint venture, unreasonably restrained trade in violation of Section 1 of the Sherman Act.[29]

The relevant line of commerce is sodium chlorate. Although the evidence does not permit a statistical market analysis for 1957 and 1958 comparable to that previously made for 1960, there is no reason to believe that the situation was substantially different in the three years. Hence the southeast will be deemed to be the only relevant market in which to determine the competitive effect of the 1957 and 1958 agreements.

### The Sales Agreement

The sales agreement had this background: In October 1957 the productive capacity of Pennsalt at its Portland plant was expanded from 7,848 to 12,392 tons. This enabled it to produce some tonnage which it could not sell on the west coast. At the time Pennsalt was desirous of exploring with Olin the possibility of a sodium chlorate joint venture in the southeast. Distribution by Olin of Pennsalt's production would permit the southeastern market to be jointly tested and enable Pennsalt to work off some of its surplus. Pennsalt thought that such a temporary arrangement might serve to stimulate Olin's interest in a joint venture. This combination of circumstances caused Pennsalt to initiate discussions with Olin which in December 1957 culminated in the agreement.

The agreement provided in substance that Pennsalt would make available to Olin's southern sales organization 2,000 tons of bulk sodium chlorate per year to be sold at prices established by local competition. Olin agreed to sell this sodium chlorate in bulk only to pulp and paper mills in the southeast. Pennsalt agreed to provide technical service upon Olin's request. Pennsalt reserved the right to serve directly only one southeastern pulp mill, Buckeye Cellulose Company at Foley, Florida. The agreement was on a

29. Transcript Argument, p. 54.

year-to-year basis, but the parties expected it would last for two or three years. The sales agreement was adhered to from the time when it was made until the joint venture agreement was signed.

The effect of the sales agreement was to preclude Olin from selling sodium chlorate manufactured by Pennsalt to anyone anywhere except pulp and paper mills in the southeast. Concurrently, it precluded Pennsalt from selling directly to the pulp and paper companies in the southeast, except Buckeye. This "territorial division" and "customer allocation", the Government asserts, foreclosed competition between Pennsalt and Olin in substantial geographical areas and consumer uses.

 While the Government does not say so in so many words, it apparently takes the position that the territorial and customer restrictions imposed by the agreement constitute *per se* violations of the Sherman Act. It has recently been held, however, that a vertical arrangement by a manufacturer and a dealer-distributor restricting the right of the latter to sell only in specified territories and to designated customers cannot be deemed, as yet, to be a *per se* violation. White Motor Company v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L. Ed.2d 738 (1963). This principle, now definitively settled, would appear to have even greater application in the instant case where the arrangement was between a manufacturer and its sales agent.

The Government argues that the sales agreement was not comparable to an arrangement between a manufacturer and distributor, such as was considered in White Motors. Rather, says the Government, the Pennsalt-Olin agreement was one between potential competitors since Pennsalt was an actual competitor in sodium chlorate and Olin was considering going into the same business.[30]

 The principle that a horizontal market division between competitors is a *per se* violation of the Sherman Act rests upon the premise that all such agreements impose naked restraints on trade and have no purpose except to stifle competition. Because of their pernicious effect on competition and lack of any redeeming virtue, they are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. White Motor Company v. United States, supra.

Thus far this principle appears to have been limited to agreements between parties which are actual competitors. The Government admits that it knows of no instance where it has been brought to bear upon potential competitors.[31] Whether it can be applied in the instant case requires consideration *in limine* of the extent to which Olin and Pennsalt were potentially competitive.

The concept of potential competition is, to say the least, a flexible one, and is subject to almost unlimited gradations in meaning. The degree of likelihood of competition may cover a broad range. In point of time its prospect may be remote or imminent. Involved may be companies which are financially weak or strong or both. The problem may concern companies with experience in manufacturing and selling the same product in other relevant markets or companies which are newcomers to the industry. The potential market may be one occupied by other competitors, or one ripe for exploitation because of the absence of competition. A whole gamut of other environmental factors may be envisioned which will bear upon the significance of the so-called potential to compete. Only if the "potential competition" is analyzed and defined in the light of the evidence can the concept be meaningful in the solution of an antitrust problem. To simply describe companies as potential competitors is not enough.

Here, although Pennsalt had a plant in Portland since 1941, it had never been able to develop any business of signifi-

---

30. Transcript of Argument, pp. 55–57.

31. Transcript of Argument, p. 57.

cance in the southeast. In its agreement with Olin it reserved the right to sell to only one customer, Buckeye. Pennsalt was able to retain the business of Buckeye only because of a unique circumstance which gave to Buckeye a particular freight advantage in receiving shipments from the west coast. The insignificance of Pennsalt as a competitive shipper from Portland to the southeast in 1960 has been discussed earlier in this opinion. The record is devoid of evidence to permit comparable analysis for 1957; but it does show that in 1957 Pennsalt shipped into the southeastern market only 597 tons. There is no reason to suppose that in 1957 Pennsalt was a more vital competitive factor in the southeast than it was in 1960.

So far as Olin is concerned, at the time when it entered into the agreement, it had never manufactured sodium chlorate for sale or sold it anywhere. Although it was studying the desirability of going into the business no decision to do so had been made.

In short, when the sales agreement was made, both Pennsalt and Olin were far removed from the point of becoming actual competitors in the southeastern market, or anywhere else. To say that they were potential competitors stretches the concept to the point where, in an antitrust context, it is virtually meaningless. Their relationship provides no basis for applying the *per se* violation rule applicable to actual competitors who agree to divide territories and customers between themselves.

So that whether the sales agreement is scrutinized simply as a contract between a manufacturer and his sales agent, analogous to the manufacturer-distributor-dealer relationship dealt with in White Motors, or is examined with emphasis upon the status of the parties as potential competitors, the "rule of reason" read into the Sherman Act by Standard Oil Co. v. United States, 221 U.S. 1, 59–62, 31 S.Ct. 502, 55 L.Ed. 619 (1911) must be applied, and the evidence examined to ascertain whether the restraint of trade which the sales agreement is said to have imposed, was unreasonable.

The sales agreement did not impose the severe territorial or customer limitations which the Government claims. It did not preclude Olin from manufacturing sodium chlorate or from purchasing it from Pennsalt's competitors; and if Olin did either it was free to sell the product to anybody outside of the southeast, and to anybody in the southeast other than pulp or paper mills.

The agreement did not prevent Pennsalt from selling sodium chlorate to anyone in the United States, except pulp and paper mills in the southeast. All that it did was to prevent Pennsalt from selling through its own personnel sodium chlorate to pulp and paper mills in the southeast. Even as to the latter business Pennsalt competed through the instrumentality of Olin, much as AmPot did through the Solvay Division of Allied Chemical.

The business which Olin was able to generate was not large. The sales which it made under the agreement in 1958 amounted to 1,113 tons, and in 1959 to 1,329 tons. In 1960, after Pennsalt and Olin had agreed to form Penn-Olin, 3,203 tons were sold. Olin enjoyed contacts and good will with the buyers which Pennsalt lacked. The probabilities are that Pennsalt was able to compete more effectively through Olin than it could have without Olin's assistance. In 1960, the year of its largest southeastern shipments, and with Olin's help, Pennsalt was only able to supply 9% of the total 47,035.76 tons shipped into the market. Of the remaining amount, Hooker and AmPot together supplied 91%. Even if the sales agreement be regarded as eliminating Pennsalt from competing for the business of the southeastern pulp and paper manufacturers, the exclusionary effect of the agreement was not substantial.

So far as a Sherman Act violation is concerned, the result must turn on the significance of the business practices in the terms of restraint of trade. United

States v. Masonite Corporation, 316 U.S. 265, 280, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). The sales agreement imposed no unreasonable restraint of trade upon sodium chlorate in the southeast, and did not violate Section 1 of the Sherman Act.

### The Production Agreement

The second pre-joint venture agreement which the Government attacks is the so-called "production agreement" entered into on February 3, 1958. This is reflected in the memorandum written the following day by Mr. Logan, Vice President of Olin. There he details a visit which he had the preceding day with top officials of Pennsalt. The memorandum states:

"Drake (Pennsalt's president) outlined their long-range interest in chlorate in the south and suggested that there was sufficient that both Pennsalt and OM had to contribute to seriously consider joint activity.

\* \* \* \* \* \*

"It is felt that neither OM nor Pennsalt should move in the chlorate or perchlorate field without keeping the other party informed and I agreed to do so.

\* \* \* \* \* \*

"Either party is to bring to the attention of the other any unusual aspects of this business which might make it desirable to proceed further with production plans."

There is no justification for the claim that this agreement destroyed all opportunities for competition between Pennsalt and Olin and that plans for independent eastern production by each company were thereby thwarted. This was neither the intention nor the effect of the agreement.

Its purpose, according to Drake, was to make certain that if one party decided to "go it alone" while the joint venture was under consideration, the other party would be so advised since it would be futile for the latter to give further consideration to the joint venture. That the agreement was not designed to curtail individual market entry or to thwart plans therefor is borne out by activities of the parties after the understanding had been reached.

In September 1958—seven months after the agreement—the agenda for Pennsalt's annual management meeting raised for firm decision the question whether it would build a sodium chlorate plant, and if so, where. At the meeting held in November 1958, tentative approval was reached to build a 30,000 ton sodium chlorate plant at Calvert City, Kentucky, 20,000 tons of which would be sold as such and 10,000 tons of which would be devoted to the production of ammonium perchlorate.[32] The action taken was based upon a study of the capital requirements and profitability of the venture reflected in a report of October 31, 1958 from A. S. Woodward, manager of engineering, to Vice President LaLande. The purpose of Pennsalt in going into perchlorates was to enable Pennsalt independently to undertake the manufacture of sodium chlorate. Pennsalt's interest in a plant of its own continued throughout 1958.

So far as Olin is concerned, the record is replete with evidence that its interest in building a sodium chlorate plant of its own was not terminated by the production agreement. Illustrative is the so-called Whither report of the Chemicals Division which was made on April 10, 1959. This recommended that Olin enter the sodium chlorate business immediately by constructing a 15,000 ton sodium chlorate plant adjacent to its existing chlorine-caustic soda plant at Mackintosh, Alabama. At a meeting on April 16, 1959 between representatives

---

32. Ammonium perchlorate is used as an oxidizer for high energy solid state missile propellants. Sodium chlorate is the raw material out of which ammonium perchlorate is made. The profit obtainable from the latter was much greater than that which could be derived from the former. A plant which produced both products would yield an overall rate of return satisfactory to Pennsalt.

of the Chemicals Division and corporate staff, the proposed Mackintosh project was not deemed sufficiently attractive to be approved. The matter was not dropped, but it was determined that there should be further study on certain specified points. In October 1959 the Chemicals Division filed another Whither report which made a definitive recommendation that sodium chlorate be a wholly Olin project but that the plant be located at Chattanooga instead of Mackintosh. Olin's corporate staff did not disapprove or otherwise act upon the October 1959 report prior to the joint venture decision of 1960.

In view of this evidence it is impossible to attribute to the production agreement the stultifying affect on individual competition by Olin and Pennsalt which the Government would ascribe to it. The agreement did not constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

A judgment will be entered dismissing the complaint as amended.

The foregoing opinion constitutes the findings of fact and conclusions of law required by F.R.Civ.P. 52(a).