UNITED STATES $v.$ PENN-OLIN
CHEMICAL CO. ET AL.

No. 503.  Argued April 30, 1964.—Decided June 22, 1964.

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Assistant Attor-*

*ney General Orrick, Philip B. Heymann* and *Robert B. Hummel.*

*H. Francis DeLone* and *Albert R. Connelly* argued the cause for appellees. With them on the brief were *William S. Potter, John W. Barnum* and *John T. Subak.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Pennsalt Chemicals Corporation and Olin Mathieson Chemical Corporation jointly formed Penn-Olin Chemical Company to produce and sell sodium chlorate in the southeastern United States. The Government seeks to dissolve this joint venture as violative of both § 7 of the Clayton Act[1] and § 1 of the Sherman Act.[2] This direct appeal, 32 Stat. 823, 15 U. S. C. § 29, from the United States District Court for the District of Delaware, raises two questions. First, whether § 7 of the Clayton Act is applicable where two corporations form a third to engage in a new enterprise; and, second, if this question is answered in the affirmative, whether there is a violation of § 1 or § 7 under the facts of this case. The trial court found that the joint venture, on this record,

---

[1] Section 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, provides in part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[2] Section 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, provides in part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

violated neither of these sections and found it unnecessary to reach the first question. 217 F. Supp. 110. In view of the importance of each of these questions in the administration of the antitrust laws, we noted probable jurisdiction. 375 U. S. 938. We have concluded that a joint venture as organized here would be subject to the regulation of § 7 of the Clayton Act and, reaching the merits, we hold that while on the present record there is no violation of § 1 of the Sherman Act, the District Court erred in dismissing the complaint as to § 7 of the Clayton Act. Accordingly, the judgment is vacated and remanded for further consideration.

### 1. LINE OF COMMERCE, RELEVANT MARKET, ETC.

At the outset it is well to note that some of the troublesome questions ordinarily found in antitrust cases have been eliminated by the parties. First, the line of commerce is a chemical known as sodium chlorate. It is produced commercially by electrolysis of an acidified solution of sodium chloride. All sodium chlorate of like purity is usable interchangeably and is used primarily in the pulp and paper industry to bleach the pulp, making for a brighter and higher quality paper. This is done by using the sodium chlorate as a principal raw material to generate chlorine dioxide, a gaseous material which bleaches cellulose fibers to a maximum whiteness with minimum loss of strength. The pulp and paper industry consumes about 64% of total production of sodium chlorate. The chemical is also employed in the production of herbicides, agricultural chemicals and in certain derivatives, such as ammonium perchlorate. Next, the relevant market is not disputed. It is the southeastern part of the United States. Nor is the fact that Olin has never engaged in the commercial production of sodium chlorate contested. It has purchased and does purchase

amounts of the chemical for internal consumption and has acted as sales agent for Pennsalt in the southeastern territory under contracts dated in December 1957 and February 1958. Olin also owns a patented process for bleaching pulp with chlorine dioxide. This process requires sodium chlorate and has been widely used by paper manufacturers under royalty-free licenses.

In addition, the record shows that while Olin and Pennsalt are in competition in the production and sale of non-chlorate chemicals, only one was selected as a "guinea pig" in the District Court to determine if the alleged violations extended to those chemicals. This was calcium hypochlorite, used in the production of pulp and paper. The trial court found that the joint venture was limited to sodium chlorate and that the joint venture plant which was built at Calvert City was constructed to produce sodium chlorate only. In the jurisdictional statement the Government indicated that it might argue that the joint venture also had an illegal impact on the calcium hypochlorite line of commerce, but this was not raised in the brief or at argument on the merits.

## 2. THE COMPANIES INVOLVED.

Pennsalt is engaged solely in the production and sale of chemicals and chemical products throughout the United States. Its assets are around a hundred million dollars and its sales are about the same amount. Its sodium chlorate production is located at Portland, Oregon, with a capacity of some 15,000 tons as of 1959. It occupied 57.8% of the market west of the Rocky Mountains. It has marketed sodium chlorate in the southeastern United States to some extent since 1957. Its shipments into that territory in 1960 were 4,186 tons of which Olin sold 3,202 tons on its sales agency contract.

Olin is a large diversified corporation, the result of a merger of Olin Industries, Inc., and Mathieson Chemical

Corporation in 1954. One of its seven divisions operates plants in 15 States and produces a wide range of chemicals and chemical products accounting for about 30% of Olin's revenues. Olin's sales in 1960 grossed some $690,000,000 and its total assets were $860,000,000.

Penn-Olin was organized in 1960 as a joint venture of Olin and Pennsalt. Each owns 50% of its stock and the officers and directors are divided equally between the parents. Its plant at Calvert City, Kentucky, was built by equal contribution of the two parents and cost $6,500,000. It has a capacity to produce 26,500 tons of sodium chlorate annually and began operations in 1961. Pennsalt operates the plant and Olin handles the sales. Penn-Olin deals in no other chemicals.

### 3. BACKGROUND AND STATISTICS OF THE INDUSTRY.

Prior to 1961 the sodium chlorate industry in the United States was made up of three producing companies. The largest producer, Hooker Chemical Corporation, entered the industry in 1956 when it acquired Oldbury Electro Chemical Company, which had been producing sodium chlorate for over half a century. Hooker now has two plants, one in the relevant marketing area at Columbus, Mississippi, which originally had a capacity of 16,000 tons but which was doubled in 1962. The other plant is at Niagara Falls, New York, with a capacity of 18,000 tons. Hooker has assets of almost $200,000,000. American Potash & Chemical Corporation entered the industry in 1955 by the acquisition of Western Electro Chemical Company. American Potash also has two plants, one located at Henderson, Nevada, with a 27,000-ton capacity and the other at Aberdeen, Mississippi (built in 1957), the capacity of which was 15,000 tons. Its assets are almost $100,000,000. The trial court found that these two corporations "had a virtual monopoly" in the relevant southeast market, holding over 90% of the market.

A third company in the industry was Pennsalt which had a 15,392-ton plant at Portland, Oregon. It entered seriously into the relevant marketing area through a sales arrangement with Olin dated December 1957 and finalized in 1958, which was aimed at testing the availability of the southeastern market. Olin as an exclusive seller was to undertake the sale of 2,000 tons of sodium chlorate per year to pulp and paper mills in the southeast (except for Buckeye Cellulose Co., at Foley, Florida, which Pennsalt reserved to serve directly). In 1960, 4,186 tons of sodium chlorate were marketed in the relevant market with the aid of this agreement. This accounted for 8.9% of the sales in that market.

During the previous decade no new firms had entered the sodium chlorate industry, and little effort had been made by existing companies to expand their facilities prior to 1957. In 1953 Olin had made available to Pennsalt its Mathieson patented process for bleaching pulp with chlorine dioxide and the latter had installed it 100% in all of the western paper mills. This process uses sodium chlorate. At about the same time the process was likewise made available, royalty free, to the entire pulp and paper industry. By 1960 most of the chlorine dioxide generated by paper manufacturers was being produced under the Olin controlled process. This created an expanding demand for sodium chlorate and by 1960 the heaviest concentration of purchasers was located in the relevant southeastern territory. By 1957 Hooker began increasing the capacity of its Columbus plant and by 1960 it had been almost doubled. American Potash sensed the need of a plant in Mississippi to compete with Hooker and began its Aberdeen plant in 1957. It was completed to a 15,000-ton capacity in 1959, and this capacity was expanded 50% by 1961.

The sales arrangement between Pennsalt and Olin, previously mentioned, was superseded by the joint ven-

ture agreement on February 11, 1960, and the Penn-Olin plant operations at Calvert City, Kentucky, began in 1961. In the same year Pittsburgh Plate Glass Company announced that it would build a plant at Lake Charles, Louisiana, with a capacity of 15,000 tons. Pittsburgh Plate Glass had operated a sodium chlorate plant in Canada.

As a result of these expansions and new entries into the southeastern market, the projected production of sodium chlorate there more than doubled. By 1962 Hooker had 32,000 tons; American Potash, 22,500 tons; Penn-Olin, 26,500 tons; and Pittsburgh Glass, 15,000 tons—a total of 96,000 tons as contrasted to 41,150 in 1959. Penn-Olin's share of the expanded relevant market was about 27.6%. Outside the relevant southeastern market Pacific Engineering and Production Company announced in July 1961 that it would construct a 5,000-ton sodium chlorate plant at Henderson, Nevada, in a joint venture with American Cyanamid Company. Pacific would put up the "know-how" and American Cyanamid the loan of the necessary money with 50% stock options.

### 4. The Setting From Which the Joint Venture Emerged.

As early as 1951 Pennsalt had considered building a plant at Calvert City and starting in 1955 it initiated several cost and market studies for a sodium chlorate plant in the southeast. Three different proposals from within its own organization were rejected prior to 1957, apparently because the rate of return was so unattractive that "the expense of refining these figures further would be unwarranted." When Hooker announced in December 1956 that it was going to increase the capacity of its Columbus plant, the interest of Pennsalt management was reactivated. It appointed a "task force" to evaluate the company's future in the eastern market; it retained

management consultants to study that market and its chief engineer prepared cost estimates. However, in December 1957 the management decided that the estimated rate of return was unattractive and considered it "unlikely" that Pennsalt would go it alone. It was suggested that Olin would be a "logical partner" in a joint venture and might in the interim be interested in distributing in the East 2,000 tons of the Portland sodium chlorate production. The sales agreement with Olin, heretofore mentioned, was eventually made. In the final draft the parties agreed that "neither . . . should move in the chlorate or perchlorate field without keeping the other party informed . . ." and that one would "bring to the attention of the other any unusual aspects of this business which might make it desirable to proceed further with production plans." Pennsalt claims that it finally decided, prior to this agreement, that it should not build a plant itself and that this decision was never reconsidered or changed. But the District Court found to the contrary.

During this same period—beginning slightly earlier—Olin began investigating the possibility of entering the sodium chlorate industry. It had never produced sodium chlorate commercially, although its predecessor had done so years before. However, the electrolytic process used in making sodium chlorate is intimately related to other operations of Olin and required the same general knowledge. Olin also possessed extensive experience in the technical aspects of bleaching pulp and paper and was intimate with the pulp and paper mills of the southeast. In April 1958 Olin's chemical division wrote and circulated to the management a "Whither Report" which stated in part:

> "We have an unparalleled opportunity to move sodium chlorate into the paper industry as the result

of our work on the installation of chlorine dioxide generators. We have a captive consumption for sodium chlorate."

And Olin's engineering supervisor concluded that entry into sodium chlorate production was "an attractive venture" since it "represents a logical expansion of the product line of the Industrial Chemicals Division . . ." with respect to "one of the major markets, pulp and paper bleaching, [with which] we have a favorable marketing position, particularly in the southeast."

The staff, however, did not agree with the engineering supervisor or the "Whither Report" and concluded "that they didn't feel that this particular project showed any merit worthy of serious consideration by the corporation at that time." They were dubious of the cost estimates and felt the need to temper their scientists' enthusiasm for new products with the uncertainties of plant construction and operation. But, as the trial court found, the testimony indicated that Olin's decision to enter the joint venture was made without determining that Olin could not or would not be an independent competitor. That question, the president of Penn-Olin testified, "never reached the point of final decision."

This led the District Court to find that "[t]he possibility of individual entry into the southeastern market had not been completely rejected by either Pennsalt or Olin before they decided upon the joint venture." 217 F. Supp. 110, 128–129.

### 5. Section 7 of the Clayton Act Applies to "Joint Ventures."

Appellees argue that § 7 applies only where the acquired company is "engaged" in commerce and that it would not apply to a newly formed corporation, such as Penn-Olin. The test, they say, is whether the enterprise

to be acquired is engaged in commerce—not whether a corporation formed as the instrumentality for the acquisition is itself engaged in commerce at the moment of its formation. We believe that this logic fails in the light of the wording of the section and its legislative background. The test of the section is the effect of the acquisition. Certainly the formation of a joint venture and purchase by the organizers of its stock would substantially lessen competition—indeed foreclose it—as between them, both being engaged in commerce. This would be true whether they were in actual or potential competition with each other and even though the new corporation was formed to create a wholly new enterprise. Realistically, the parents would not compete with their progeny. Moreover, in this case the progeny was organized to further the business of its parents, already in commerce, and the fact that it was organized specifically to engage in commerce should bring it within the coverage of § 7. In addition, long prior to trial Penn-Olin was actually engaged in commerce. To hold that it was not "would be illogical and disrespectful of the plain congressional purpose in amending § 7 . . . [for] it would create a large loophole in a statute designed to close a loophole." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 343 (1963). In any event, Penn-Olin was engaged in commerce at the time of suit and the economic effects of an acquisition are to be measured at that point rather than at the time of acquisition. *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 607 (1957). The technicality could, therefore, be averted by merely refiling an amended complaint at the time of trial. This would be a useless requirement.

6. THE APPLICATION OF THE MERGER DOCTRINE.

This is the first case reaching this Court and on which we have written that directly involves the validity under § 7 of the joint participation of two corporations in the

creation of a third as a new domestic producing organization.[3]  We are, therefore, plowing new ground.  It is true, however, that some aspects of the problem might be found in *United States* v. *Terminal R. Assn.,* 224 U. S. 383 (1912), and *Associated Press* v. *United States,* 326 U. S. 1 (1945), where joint ventures with great market power were subjected to control, even prior to the amendment to § 7.

It is said that joint ventures were utilized in ancient times, according to Taubman, who traces them to Babylonian "commenda" and Roman "societas."  Taubman, The Joint Venture and Tax Classification, 27–81 (1957).  Their economic significance has grown tremendously in the last score of years, having been spurred on by the need for speed and size in fashioning a war machine during the early forties.  Postwar use of joint subsidiaries and joint projects led to the spawning of thousands of such ventures in an effort to perform the commercial tasks confronting an expanding economy.

The joint venture, like the "merger" and the "conglomeration," often creates anticompetitive dangers.  It is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another.  The result is "a triumvirate of associated corporations."[4]  If the parent companies are in competition, or might compete absent the joint venture, it may be assumed that neither will compete with the progeny in its line of commerce.  Inevitably, the operations of the joint venture will be frozen to those lines of commerce which will not bring it into competition with the parents, and the latter, by the same token will be foreclosed from the joint venture's market.

---

[3] For a discussion of the problem, see Kaysen & Turner, Antitrust Policy, 136–141 (1959).

[4] See Note, Applicability of § 7 to a Joint Venture, 11 U. C. L. A. L. Rev. 393, 396.

This is not to say that the joint venture is controlled by the same criteria as the merger or conglomeration. The merger eliminates one of the participating corporations from the market while a joint venture creates a new competitive force therein. See *United States* v. *Philadelphia National Bank, supra; Brown Shoe Co.* v. *United States,* 370 U. S. 294 (1962); *United States* v. *Aluminum Co. of America,* 377 U. S. 271 (1964). The rule of *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651 (1964), where a corporation sought to protect its market by acquiring a potential competitor, would, of course, apply to a joint venture where the same intent was present in the organization of the new corporation.

Overall, the same considerations apply to joint ventures as to mergers, for in each instance we are but expounding a national policy enunciated by the Congress to preserve and promote a free competitive economy. In furtherance of that policy, now entering upon its 75th year, this Court has formulated appropriate criteria, first under the Sherman Act and now, also, under the Clayton Act and other antitrust legislation. The Celler-Kefauver Amendment to § 7, with which we now deal, was the answer of the Congress to a loophole found to exist in the original enactment. See *Brown Shoe Co.* v. *United States, supra,* and *United States* v. *Philadelphia National Bank, supra.* However, in an earlier case, this Court, while considering the effect of a stock acquisition under the original § 7, declared in *United States* v. *E. I. du Pont de Nemours & Co., supra,* at 592: "We hold that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce . . . ." The grand design of the original § 7, as to stock acquisitions, as well as the Celler-Kefauver Amendment, as to the acquisition of assets, was

to arrest incipient threats to competition which the Sherman Act did not ordinarily reach. It follows that actual restraints need not be proved. The requirements of the amendment are satisfied when a "tendency" toward monopoly or the "reasonable likelihood" of a substantial lessening of competition in the relevant market is shown. Congress made it plain that the validity of such arrangements was to be gauged on a broader scale by using the words "may be substantially to lessen competition" which "indicate that its concern was with probabilities, not certainties." *Brown Shoe Co.* v. *United States, supra,* at 323. And, as we said with reference to another merger, in *United States* v. *Philadelphia National Bank, supra,* at 362:

> "Clearly, this is not the kind of question which is susceptible of a ready and precise answer in most cases. It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.' See *Brown Shoe Co., supra,* at 317, 322. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive."

And in the most recent merger case before the Court, *United States* v. *Aluminum Co. of America, supra,* the appellee had acquired a small competitor, Rome Cable Corporation. The Court noted that the acquisition gave appellee only 1.3% additional control of the aluminum conductor market. "But in this setting," the Court said,

> "that seems to us reasonably likely to produce a substantial lessening of competition within the mean-

ing of § 7. . . . It would seem that the situation in the aluminum industry may be oligopolistic. As that condition develops, the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge. That tendency may well be thwarted by the presence of small but significant competitors." At 280.

## 7. THE CRITERIA GOVERNING § 7 CASES.

We apply the light of these considerations in the merger cases to the problem confronting us here. The District Court found that "Pennsalt and Olin each possessed the resources and general capability needed to build its own plant in the southeast and to compete with Hooker and [American Potash] in that market. Each could have done so if it had wished." 217 F. Supp. 110, 129.[5] In addition, the District Court found that, contrary to the position of the management of Olin and Pennsalt, "the forecasts of each company indicated that a plant could be operated with profit." *Ibid.*

The District Court held, however, that these considerations had no controlling significance, except "as a factor in determining whether as a matter of probability

---

[5] The court explained further: "At the time when the joint venture was agreed upon Pennsalt and Olin each had an extensive background in sodium chlorate. Pennsalt had years of experience in manufacturing and selling it. Although Olin had never been a commercial manufacturer, it possessed a substantially developed manufacturing technique of its own, and also had available to it a process developed by Vickers-Krebs with whom it had been negotiating to construct a plant. Olin had contacts among the southeastern pulp and paper mills which Pennsalt lacked, but Pennsalt's own estimates indicate that in a reasonable time it would develop adequate business to support a plant if it decided to build. A suitable location for a plant was available to each company—Calvert City, Kentucky for Pennsalt, and the TVA area around Chattanooga, Tennessee for Olin. The financing required would not have been a problem for either company." *Ibid.*

*both* companies would have entered the market as individual competitors if Penn-Olin had not been formed. Only in this event would potential competition between the two companies have been foreclosed by the joint venture." *Id.*, at 130. In this regard the court found it "impossible to conclude that as a matter of reasonable probability *both* Pennsalt and Olin would have built plants in the southeast if Penn-Olin had not been created." *Ibid.* The court made no decision concerning the probability that one would have built "while the other continued to ponder." It found that this "hypothesized situation affords no basis for concluding that Penn-Olin had the effect of substantially lessening competition." *Ibid.* That would depend, the court said, "upon the competitive impact which Penn-Olin will have as against that which might have resulted if Pennsalt or Olin had been an individual market entrant." *Ibid.* The court found that this impact could not be determined from the record in this case. "Solely as a matter of theory," it said, ". . . no reason exists to suppose that Penn-Olin will be a less effective competitor than Pennsalt or Olin would have been. The contrary conclusion is the more reasonable." *Id.*, at 131.

We believe that the court erred in this regard. Certainly the sole test would not be the probability that *both* companies would have entered the market. Nor would the consideration be limited to the probability that one entered alone. There still remained for consideration the fact that Penn-Olin eliminated the potential competition of the corporation that might have remained at the edge of the market, continually threatening to enter. Just as a merger eliminates actual competition, this joint venture may well foreclose any prospect of competition between Olin and Pennsalt in the relevant sodium chlorate market. The difference, of course, is that the merger's foreclosure is present while the joint ven-

ture's is prospective. Nevertheless, "[p]otential compe-
tition . . . as a substitute for . . . [actual competition]
may restrain producers from overcharging those to whom
they sell or underpaying those from whom they buy. . . .
Potential competition, insofar as the threat survives [as
it would have here in the absence of Penn-Olin], may
compensate in part for the imperfection characteristic of
actual competition in the great majority of competitive
markets." Wilcox, Competition and Monopoly in Amer-
ican Industry, TNEC Monograph No. 21 (1940) 7–8.
Potential competition cannot be put to a subjective test.
It is not "susceptible of a ready and precise answer." As
we found in *United States* v. *El Paso Natural Gas Co.,*
*supra,* at 660, the "effect on competition . . . is deter-
mined by the nature or extent of that market and by the
nearness of the absorbed company to it, that company's
eagerness to enter that market, its resourcefulness, and so
on." The position of a company "as a competitive fac-
tor . . . was not disproved by the fact that it had never
sold . . . there. . . . [I]t is irrelevant in a market . . .
where incremental needs are booming." The existence
of an aggressive, well equipped and well financed cor-
poration engaged in the same or related lines of commerce
waiting anxiously to enter an oligopolistic market would
be a substantial incentive to competition which cannot be
underestimated. Witness the expansion undertaken by
Hooker and American Potash as soon as they heard of
the interest of Olin Mathieson and of Pennsalt in south-
east territory. This same situation might well have come
about had either Olin or Pennsalt entered the relevant
market alone and the other remained aloof watching
developments.

## 8. THE PROBLEM OF PROOF.

Here the evidence shows beyond question that the
industry was rapidly expanding; the relevant southeast
market was requiring about one-half of the national

production of sodium chlorate; few corporations had the inclination, resources and know-how to enter this market; both parent corporations of Penn-Olin had great resources; each had long been identified with the industry, one owning valuable patent rights while the other had engaged in sodium chlorate production for years; each had other chemicals, the production of which required the use of sodium chlorate; right up to the creation of Penn-Olin, each had evidenced a long-sustained and strong interest in entering the relevant market area; each enjoyed good reputation and business connections with the major consumers of sodium chlorate in the relevant market, *i. e.*, the pulp and paper mills; and, finally, each had the know-how and the capacity to enter that market and could have done so individually at a reasonable profit. Moreover, each company had compelling reasons for entering the southeast market. Pennsalt needed to expand its sales to the southeast, which it could not do economically without a plant in that area. Olin was motivated by "the fact that [it was] already buying and using a fair quantity [of sodium chlorate] for the production of sodium chlorite and that [it was] promoting the Mathieson process of the generation of chlorine dioxide which uses sodium chlorate." Unless we are going to require subjective evidence, this array of probability certainly reaches the prima facie stage. As we have indicated, to require more would be to read the statutory requirement of reasonable probability into a requirement of certainty. This we will not do.

However, despite these strong circumstances, we are not disposed to disturb the court's finding that there was not a reasonable probability that both Pennsalt and Olin would have built a plant in the relevant market area. But we have concluded that a finding should have been made as to the reasonable probability that either one of the corporations would have entered the market by building

a plant, while the other would have remained a significant potential competitor. The trial court said that this question "need not be decided." It is not clear whether this conclusion was based on the erroneous assumption that the Government could not show a lessening of competition even if such a situation existed, or upon the theory (which the court found erroneous in its final opinion) that the Government need not show the impact of such an event on competition in the relevant market as compared with the entry of Penn-Olin. The court may also have concluded that there was no evidence in the record on which to base such a finding. In any event, we prefer that the trial court pass upon this question and we venture no opinion thereon. Since the trial court might have been concerned over whether there was evidence on this point,[6] we reiterate that it is impossible to demonstrate the *precise* competitive effects of the elimination of either Pennsalt or Olin as a potential competitor. As the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) put it:

> "The basic characteristic of effective competition in the economic sense is that no one seller, and no group of sellers acting in concert, has the power to choose its level of profits by giving less and charging more. Where there is workable competition, rival sellers, whether existing competitors or new or potential entrants into the field, would keep this power in check by offering or threatening to offer effective inducements . . . ." At 320.

There being no proof of specific intent to use Penn-Olin as a vehicle to eliminate competition, nor evidence of collateral restrictive agreements between the joint venturers, we put those situations to one side. We note generally the following criteria which the trial court might

---

[6] In this regard, the court should, of course, open the record for further testimony if the parties so desire.

take into account in assessing the probability of a substantial lessening of competition: the number and power of the competitors in the relevant market; the background of their growth; the power of the joint venturers; the relationship of their lines of commerce; the competition existing between them and the power of each in dealing with the competitors of the other; the setting in which the joint venture was created; the reasons and necessities for its existence; the joint venture's line of commerce and the relationship thereof to that of its parents; the adaptability of its line of commerce to noncompetitive practices; the potential power of the joint venture in the relevant market; an appraisal of what the competition in the relevant market would have been if one of the joint venturers had entered it alone instead of through Penn-Olin; the effect, in the event of this occurrence, of the other joint venturer's potential competition; and such other factors as might indicate potential risk to competition in the relevant market. In weighing these factors the court should remember that the mandate of the Congress is in terms of the probability of a lessening of substantial competition, not in terms of tangible present restraint.

The judgment is therefore vacated and the case is remanded for further proceedings in conformity with this opinion. *Vacated and remanded.*

MR. JUSTICE WHITE dissents.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK agrees, dissenting.

Agreements among competitors [1] to divide markets are *per se* violations of the Sherman Act.[2] The most de-

---

[1] *White Motor Co.* v. *United States*, 372 U. S. 253, was a vertical arrangement involving a territorial restriction whose validity we con-

tailed, grandiose scheme of that kind is disclosed in *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, where industrialists, acting like commissars in modern communist countries, determined what tonnage should be produced by each company and what territory was "free" and what was "bonus." The Court said: "Total suppression of the trade in the commodity is not necessary in order to render the combination one in restraint of trade. It is the effect of the combination in limiting and restricting the right of each of the members to transact business in the ordinary way, as well as its effect upon the volume or extent of the dealing in the commodity, that is regarded." *Id.,* at 244–245.

In *United States* v. *National Lead Co.,* 332 U. S. 319,[3] a Sherman Act violation resulted from a division of world markets for titanium pigments, the key being allocation of territories through patent license agreements. A similar arrangement was struck down in *Timken Co.* v. *United States,* 341 U. S. 593, where world trade territories were allocated among an American, a British, and a French company through intercorporate arrangements called a "joint venture." *Nationwide Trailer Rental System, Inc.,* v. *United States,* 355 U. S. 10 (affirming 156 F. Supp. 800), held violative of the antitrust laws an agreement establishing exclusive territories for each member of an organization set up to regulate the one-way trailer rental industry and empowering a member to prevent any other operator from becoming a member in his area.

In the late 1950's the only producers of sodium chlorate in the United States were Pennsalt, one of the appellees

---

cluded could be determined only after a trial, not on motion for summary judgment.

[2] See Oppenheim, Antitrust Booms and Boomerangs, 59 Nw. U. L. Rev. 33, 35 (1964).

[3] The findings of fact are detailed in 63 F. Supp. 513.

in this case, Hooker Chemical Corporation, and American Potash and Chemical Corporation. No new firms had entered the industry for a decade. Prices seemed to be stable and little effort had been made to expand existing uses or to develop new ones. But during the 1950's the sodium chlorate market began to grow, chiefly on account of the adoption of chlorine dioxide bleaching in the pulp industry. Domestic production more than quadrupled between 1950 and 1960. The growth was the most pronounced in the southeast. By 1960 the southeast had the heaviest concentration of sodium chlorate buyers, the largest being the pulp and paper mills; and nearly half the national sodium chlorate productive capacity. In 1960 the southeast market was divided among the three producers as follows: Hooker, 49.5%, American Potash, 41.6%, Pennsalt, 8.9%

Pennsalt, whose only sodium chlorate plant was at Portland, Oregon, became interested in establishing a plant in the rapidly growing southeast sodium chlorate market. It made cost studies as early as 1951 for such a project; and from 1955 on it gave the matter almost continuous consideration. In 1957 it decided to explore the possibility either of going it alone or doing it jointly with Olin. Pennsalt received from its staff and experts various studies in this regard and continued to have negotiations with Olin for a joint venture, and postponed its unilateral project from time to time pending receipt of word from Olin. Its final decision was in fact made when Penn-Olin was organized February 25, 1960, pursuant to a joint venture agreement between Olin and Pennsalt, dated two weeks earlier.

In the early 1950's Olin too was investigating the possibilities of entering the southeast industry. It took various steps looking toward establishment of a production plant in the southeastern United States. It received numerous reports from its staff and its experts and it went

so far in November 1959 as to reach a tentative agreement with a British construction company for the construction of a plant. Its unilateral projects were, however, all dropped when the agreement for the joint venture with Pennsalt was reached.

During the years when Pennsalt and Olin were considering independent entry into the southeast market, they were also discussing joint entry. In order to test the southeast market the two agreed in December of 1957 that Pennsalt would make available to Olin, as exclusive seller, 2,000 tons of sodium chlorate per year for two or three years, Olin agreeing to sell the chemical only to pulp and paper companies in the southeast, except for one company which Pennsalt reserved the right to serve directly. Another agreement entered into in February 1958 provided that neither of the two companies would "move in the chlorate or perchlorate field without keeping the other party informed." And each by the agreement bound itself "to bring to the attention of the other any unusual aspects of this business which might make it desirable to proceed further with production plans." The purpose of this latter agreement, it was found, was to assure that each party would advise the other of any plans independently to enter the market before it would take any definite action on its own.

So what we have in substance is two major companies who on the eve of competitive projects in the southeastern market join forces. In principle the case is no different from one where Pennsalt and Olin decide to divide the southeastern market as was done in *Addyston Pipe* and in the other division-of-markets cases already summarized. Through the "joint venture" they do indeed divide it fifty-fifty. That division through the device of the "joint venture" is as plain and precise as though made in more formal agreements. As we saw in the *Timken* case,

"agreements between legally separate persons and companies to suppress competition among themselves and others" cannot be justified "by labeling the project a 'joint venture.'" 341 U. S., at 598. And we added, "Perhaps every agreement and combination to restrain trade could be so labeled." *Ibid.* What may not be done by two companies who decide to divide a market surely cannot be done by the convenient creation of a legal umbrella—whether joint venture or common ownership and control (see *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 215)—under which they achieve the same objective by moving in unison.

An actual division of the market through the device of "joint venture" has, I think, the effect "substantially to lessen competition" within the meaning of § 7 of the Clayton Act.[4] The District Court found that neither Pennsalt nor Olin had completely rejected the idea of independent entry into the southeast. But the court also found that it is "impossible to conclude that as a matter of reasonable probability *both* Pennsalt and Olin would have built plants in the southeast if Penn-Olin had not been created." The only hypothesis acceptable to it was that either Pennsalt or Olin—but not both—would have entered the southeastern market as an independent competitor had the "joint venture" not materialized. On that assumption the only effect of the "joint venture" was

---

[4] Section 7 of the Clayton Act covers the acquisition by a corporation engaged in interstate commerce of the stock or assets of another corporation also engaged in interstate commerce. An acquisition qualifies under § 7 if the firm that is acquired is either conducting business in interstate commerce or intending or preparing to do so. It seems clear from the record in this case that Penn-Olin was from its inception intended by its organizers to engage in interstate commerce; and it in fact immediately began to arrange for or conduct such business. It was therefore "engaged" in interstate commerce within the meaning of § 7 when Pennsalt and Olin acquired its stock.

"to eliminate Pennsalt or Olin, as the case may be, as a competitor." In that posture of the case, the District Court was unwilling to conclude that the creation of Penn-Olin had the effect of substantially lessening competition.

We do not, of course, know for certain what would have happened if the "joint venture" had not materialized. But we do know that § 7 deals only with probabilities, not certainties. We know that the interest of each company in the project was lively, that one if not both of them would probably have entered that market, and that even if only one had entered at the beginning the presence of the other on the periphery would in all likelihood have been a potent competitive factor. Cf. *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651,661. We also know that as between Pennsalt and Olin the "joint venture" foreclosed all future competition by dividing the market fifty-fifty. That could not have been done consistently with our decisions had the "joint venture" been created after Pennsalt and Olin had entered the market or after either had done so. To allow the joint venture to obtain antitrust immunity because it was launched at the very threshold of the entry of two potential competitors into a territory is to let § 7 be avoided by sophisticated devices.

There is no need to remand this case for a finding "as to the reasonable probability that either one of the corporations would have entered the market by building a plant, while the other would have remained a significant potential competitor." *Ante,* pp. 175–176. This case—now almost three years in litigation—has already produced a trial extending over a 23-day period, the introduction of approximately 450 exhibits, and a 1,600-page record. We should not require the investment of additional time, money, and effort where, as here, a case turns on one cru-

cial finding and the record is sufficient to enable this Court—which is as competent in this regard as the District Court—to supply it.

MR. JUSTICE HARLAN, dissenting.

I can see no purpose to be served by this remand except to give the Government an opportunity to retrieve an antitrust case which it has lost, and properly so. Believing that this Court should not lend itself to such a course, I would affirm the judgment of the District Court.