Edward D. VARNEY

v.

The COLEMAN COMPANY, INC., and
Skiroule Ltee.

Civ. A. No. 72–118.

United States District Court,
D. New Hampshire.

Nov. 4, 1974.

John P. Griffith, Hamblett, Kerrigan, LaTourette & Lopez, Nashua, N. H., for plaintiff.

Shane Devine, Devine, Millimet, Stahl & Branch, Manchester, N. H., John R. Hally, Nutter, McClennen & Gish, Boston, Mass., for defendants.

## OPINION

BOWNES, District Judge.

In the Spring of 1970, The Coleman Company, Inc., ("Coleman") terminated the distribution contract of Edward D. Varney ("Varney" or "plaintiff"). As a result of that termination, Varney

initiated an action based in part on civil treble-damage antitrust claims pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. The complaint also contains a count brought pursuant to the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221.

Defendants have moved for summary judgment as to these counts. A hearing was held on the motion on September 26, 1974.

## FACTS

The plaintiff Varney operated an individual proprietorship, which sometimes did business as Northern Distributors. Plaintiff acted as distributor in the New England states between 1966 and 1970 for the snowmobiles manufactured by defendant Skiroule Ltee ("Skiroule") and its predecessor organization. Plaintiff's distributorship agreements covered only Maine and New Hampshire at first, but were subsequently extended to include all New England states. Plaintiff operated under one year contracts until 1969, at which time he executed a three-year contract covering the snowmobile seasons 1969–70, 1970–71, and 1971–72.

As a distributor, plaintiff was charged with purchasing prescribed quotas of snowmobiles from Skiroule and reselling them to dealers, many of whom were recruited by plaintiff. Additionally, plaintiff was responsible for delivering the snowmobiles to the dealers, stocking parts, arranging service and honoring warranties.

In the three seasons preceding the sale of his distributorship, plaintiff increased sales from approximately $170,000 in 1967–68 to $705,000 in 1968–69 and to $1,275,000 in 1969–70. His approximate net profits in those years were $8,500, $8,600, and $16,000, respectively.

Defendant Coleman is a publicly-held Kansas-based corporation, which since 1960 has emphasized sales of outdoor recreational products and air controlled products related to residential and recreational shelter structures.

Coleman never profited from the sale of snowmobiles, which amounted to approximately 10% of its total sales. Coleman's snowmobile operations lost more than $1,000,000 in 1971 and c. $1,000,000 in 1972. Coleman sold the snowmobile division in August, 1974, at a loss of millions of dollars.

Defendant Skiroule was a Canadian company. Its founder, Rejean Houle, first manufactured snowmobiles in 1965, incorporating Skiroule Ltee in 1967. From the outset, Skiroule distributed on a direct-to-dealer basis in its largest single market, Quebec, and primarily through distributors such as plaintiff elsewhere.

Skiroule grew rapidly, selling c. 1,500 machines in 1966–67, c. 7,000 machines in 1968 and c. 15,000 in 1969–70.

In early 1969, a business broker brought Skiroule to the attention of Coleman. Negotiations followed, and a formal closing occurred on December 23, 1969, when Coleman purchased Skiroule in consideration of c. $14,000,000 made up of cash and principally common stock of Coleman.

The snowmobile market boomed in the years 1965 to 1969, and levelled off thereafter. Canadian production grew from c. 36,000 machines to c. 185,000 machines during the years 1965–69. In North America the growth was from c. 75,000 to c. 285,000 machines. The market has always been dominated by the Canadian company, Bombardier, Ltd., which has a current market share of approximately 50%, up from the approximate 40% it controlled when Coleman purchased Skiroule.

Of the sixty to sixty-five firms that were in the snowmobile market at the time of the purchase of Skiroule, Skiroule was among the market's top ten manufacturers. However, its total market share of 3.5% in 1968–69 and an estimated 4.7% in 1969–70 placed it among the lowest four of the top ten, which together shared about twelve-to-

fourteen percent of the market, or about the same amount as the fifth and sixth largest firms combined. Skiroule controlled less than 2% of the New England market and 3% or less of the United States market for the years 1970 and 1971.

The history of the negotiations between Varney and defendants is contested, but for the purposes of ruling on the motion for summary judgment, it is sufficient to know that, after the sale of Skiroule, defendants acquired rights to distribute their snowmobiles from all five United States distributors, including plaintiff.

## ISSUES

1. Were defendants' negotiations for the acquisition of plaintiff's dealership agreement and other conduct behavior that constituted a contract, combination or conspiracy in violation of Section 1 of the Sherman Act?

2. Was the foregoing behavior indicative of an attempt to monopolize in violation of Section 2 of the Sherman Act?

3. Was control of the distribution of Skiroule snowmobiles tantamount either to an attempt to monopolize or a monopoly in New England in violation of Section 2 of the Sherman Act?

4. Did Coleman's acquisition of Skiroule substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act?

5. Did Coleman's acquisition of Skiroule substantially lessen competition or tend to create a monopoly with respect to the distribution of Skiroule snowmobiles in New England in violation of Section 7 of the Clayton Act?

6. Do snowmobiles fall within the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq.; and if they do, did the conduct of the defendants constitute a breach of "good faith" within the meaning of that Act?

## I. *Section 1 of the Sherman Act*

Plaintiff alleges that defendants' acquisition of his dealership and other conduct constituted a contract, combination or conspiracy in violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part:

/ Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: . . .

██ Movants are not without the purview of Section 1 of the Sherman Act because they were part of a single business entity at the time of the events complained of. Perma Life Mufflers, Inc. v. Intl. Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). "[T]he fact of common ownership [cannot] save them from any of the obligations that the law imposes on separate entities." Id. at 141–142, 88 S.Ct. at 1986. While a parent and subsidiary may unlawfully conspire, not every agreement between them is an unlawful conspiracy. Accordingly, it has been held that a manufacturer may freely exercise its discretion as to the parties with whom it will deal in the absence of some forbidden anticompetitive or monopolistic objective. See United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

█ Some objectives are illegal *per se*. These include price-fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); refusal by a cartel to deal with non-members, Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); and certain tie-in agreements, Int'l Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

██ Where the facts do not fall within one of the *per se* categories, they are tested by the prohibition against unreasonable restraints of trade.

Standard Oil Co. of N. J. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Restraints are unreasonable when accompanied by "a specific intent to accomplish a forbidden restraint." United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948). Circumstantial evidence may and often must be adduced to glean intent. Courts are advised to focus on "the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize." *Id.* at 527, 68 S.Ct. at 1124. Certainly, unlawful consequences require the inference of a specific intent to monopolize. United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1949). Quoting Mr. Justice Holmes, *Griffith* reasoned:

> "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. . . ."

There is nothing in either the complaint or the facts underlying it to suggest that defendant has committed a *per se* violation. Therefore, the issue is narrowed to "whether the action [complained of] springs from business requirements or purpose to monopolize." *Columbia Steel Co., supra* at 527, 68 S. Ct. at 1124.

██ It is settled law that a manufacturer may terminate a distributor without violation of the antitrust laws if the decision to terminate is based on a reasonable and legitimate business decision. Alpha Distributing Co. v. Jack Daniel Distillery, 454 F.2d 442 (9th Cir. 1972); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1960), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321 (E.D.N.Y.1970), aff'd 451 F.2d 593 (2d Cir. 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

In Ricchetti v. Meister Brau, Inc., 431 F.2d 1211 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971), Meister Brau acquired the Burgermeister Beer Company and thereupon terminated some of the Burgermeister distributors, appointing other distributors in their places. The terminated distributors alleged that their terminations reduced sales volumes, which would drive them out of business, thereby reducing competition in a market already having a present trend towards concentration.

In holding against plaintiffs, the court found no evidence that the terminations were accompanied by any unlawful, anticompetitive goals and that in such event, precedents permitted terminations of dealers notwithstanding the negative effect on the businesses of the terminated dealers. *Ricchetti, supra* at 1214. It was also observed that a manufacturer's desire for a stronger marketing force would have a favorable impact on competition. *Id.* at 1215.

In E. A. Weinel Constr. Co. v. Mueller Co., 289 F.Supp. 293 (E.D.Ill.1968), defendant manufactured pipe and valve supplies that were exclusive to him and sold these products through plaintiff as distributor. Plaintiff did not fall behind in his payments at any time. Subsequently, defendant stopped offering these products to the distributor on the terms offered other similarly situated distributors. Defendant claimed that the change was due to its reclassifying plaintiff as a contractor.

In ruling for the defendant, the court stated:

> Every manufacturer has a natural and complete monopoly of his particular product, especially when sold under his own private brand or trade name. If he is engaged in a private business, he is free to exploit this monopoly by selling his product directly to the ul-

timate consumer or through one or more distributors or dealers, as he may deem most profitable to him. If he chooses to sell through distributors or dealers, he may exercise his own independent discretion as to the parties with whom he will deal. This is a common law right which the anti-trust laws have not destroyed; and a refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the anti-trust laws. (*Id.* at 297–298.)

\* \* \* \* \* \*

A manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself; and a refusal to deal becomes illegal under the Act only when it produces an unreasonable restraint of trade, . . . . (*Id.*)

In the instant case, there is deposition testimony that defendants were eager to purchase plaintiff's distributorship, because (1) plaintiff was backlogging his accounts payable (House, Dep. at 51); (2) Coleman wanted to supplement sales in its camper trailer division (Jones, Dep. at 42); (3) Skiroule had long wanted to go directly to dealers, but had lacked the money to do so (Beland, Dep. at 19, 21); (4) Skiroule wanted greater control over its sales forces (*id.* at 19); and (5) Skiroule had successfully gone directly to dealers in Canada (*id.* at 22); (Jones, Dep. at 42). Finally, an independent study by the accountants, Ernst & Ernst, of Skiroule completed prior to the closing of the acquisition noted that Skiroule had a plan to go directly to dealers in order to effect a gross saving of $100 to $125 per vehicle. (Plaintiff's Exhibit 62 at 19.)

█ In brief, then, there is evidence that defendants' reasons for acquiring plaintiff's distributorship were in pursuit of the legitimate business purposes of, *inter alia,* reducing the price of the product, utilizing existing sales forces and exercising greater control of the sale of the product.

Plaintiff's only retort to this sworn testimony is the allegations or denials or both as such appear on his pleadings and supporting memoranda. Of course, defendants' testimony must be viewed through jaundice-colored lenses, but its veracity is enhanced particularly by Skiroule's declaration to Ernst & Ernst prior to any possibility of litigation that it wanted direct-to-dealer sales to reduce retail price and by the absence of any contradictory circumstantial evidence. No specific intent to unreasonably restrain trade can be gleaned from the consequences of defendants' decision to bypass distributors. Skiroule's share of the United States-Canadian market at the time of the acquisition was, at the most, 5% declining to 4.5% by 1971. Coleman lost money in each of the years following the merger and finally disposed of the snowmobile operation in August, 1974, at a loss of millions of dollars. The squeeze in the market for snowmobiles and the resultant losses to Skiroule confirmed the legitimacy of defendants' business concerns with respect to its marketing program.

## II. *Section 2 of the Sherman Act*

A. Plaintiff alleges in Count II of his complaint that the acquisition and related conduct was an attempt to monopolize in violation of Section 2 of the Sherman Act. Section 2 of the Sherman Act, 15 U.S.C. § 2, provides in relevant part:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty . . . .

█ Plaintiff does not charge monopoly here, confining himself instead to a charge of "attempt to monopolize." Plaintiff must, therefore, prove that defendants had the specific intent to attempt to monopolize. "While the completed offense of monopolization under § 2 demands only a general intent to do

the act, 'for no monopolist monopolizes unconscious of what he is doing,' a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt now charged." Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953) (citations omitted).

Plaintiff must also prove that the specific intent to monopolize produced a dangerous probability of success.

> (Holmes, C. J.): [W]hen that intent and the consequent dangerous probability exist, this statute [Sherman Act], like many others, and like the common law in some cases, directs itself against the dangerous probability as well as against the completed result. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905).

Plaintiff argues against the imposition of the requirement of dangerous probability. He refers to Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964), for support. While that court did "reject the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize," id. at 474, it arrived at that position by interpreting "consequent" in Mr. Justice Holmes's statement as part and parcel of "specific intent," id. n. 46, rather than as a distinct element. I disagree with Lessig. Mr. Justice Holmes intended specific intent and dangerous probability to be separate elements when, in the sentence preceding that which Lessig referenced, he wrote: "an intent to bring it [monopoly] to pass is necessary in order to produce a dangerous probability that it will happen." (196 U.S. at 396, 25 S.Ct. at 279.) By describing a causal relationship,

Holmes clearly intended two components: the cause (intent) and the effect (dangerous probability).

More important than an explication of Holmes's statement is that the dual-element approach is one of common sense. Without the element of dangerous probability, courts would wander down avenues of de minimis significance. In any event, notwithstanding its objection to dangerous probability as a separate element, Lessig allows dangerous probability a role in determining specific intent:

> a [dangerous] probability may be relevant circumstantial evidence of intent . . . .. Id. 327 F.2d at 474.

■■■ I cannot decide as a matter of law whether or not defendants had the specific intent to build monopoly. I can decide, however, that if the intent was present, there was no dangerous probability of success. Plaintiff has pointed to no evidence that defendants were able to exclude actual or potential competition from any of the proposed relevant markets. See Rea v. Ford Motor Co., 497 F.2d 577, 590 n. 28 (3d Cir. 1974) (Van Dusen, C. J.). Indeed, Skiroule's share of its markets declined.

It should be pointed out that even were I to accept the Lessig approach and reject dangerous probability as an element, the absence of dangerous probability of success would be persuasive, circumstantial evidence that defendant did not have a specific intent to monopolize.[1]

■■■ B. Plaintiff alleges in Count VII of his complaint that defendants' control of Skiroule snowmobiles in New England was either an attempt to monopolize or a monopoly in violation of Section 2 of the Sherman Act.

---

1. Plaintiff argues that cases ignoring dangerous probability sometimes ignore relevant market. Lessig, supra, 327 F.2d at 586; Coleman Motor Co. v. Chrysler Corp., 376 F.Supp. 546 (W.D.Pa.1974); contra Industrial Bldg. Materials, Inc. v. Interchemical Corp., 437 F.2d 1336 (9th Cir. 1973); American Football League v. Nat'l Football League, 323 F.2d 124 (4th Cir. 1963). These cases do require evidence that an appreciable segment of commerce has been affected. As a matter of law, there is no such affect here, and, therefore, my decision would not change if I used plaintiff's proposed single element test.

"Every manufacturer has a natural and complete monopoly of his particular product." E. A. Weinel Constr. Co. v. Mueller Co., 289 F.Supp. 293, 297 (E.D. Ill.1968). To sustain this antitrust allegation, plaintiff must establish monopolizing acts within the relevant product line and geographic market involved. *See* Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

■ As stated in the pertinent counts of the complaint, the relevant geographic market is New England. It cannot be seriously argued that different brands of snowmobiles have greater distinguishability than do Fords, Plymouths, Chevrolets, and Ramblers, which have been held to belong to a single product line. *See* Madsen v. Chrysler Corp., 261 F.Supp. 488, 506 (N.D.Ill. E.D.1966). The relevant product line here is all commercial brands of snowmobiles. In 1970, Skiroule snowmobiles had a market share of 1.6% which rose in 1971 to 1.85%. Such percentages are *de minimis* and as a matter of law do not support a claim of power sufficient to have monopolistic influence upon prices and competition in the relevant market. *See du Pont & Co., supra* at 351 U.S. 380, 76 S.Ct. 994.

### III. *Clayton Act*

A. Plaintiff alleges in Count III that the acquisition of Skiroule substantially lessened competition in violation of Section 7 of the Clayton Act. Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in relevant part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

"A primary purpose of the legislation was 'to limit future increases in the level of economic concentration resulting from corporate mergers and acquisitions' . . . . " Blake, Conglomerate Mergers, 73 Col.L.Rev. 555, 585 (March 1973).

"The statutory test is whether the effect of the merger 'may be substantially to lessen competition' in any line of commerce in any section of the country." United States v. Phila. Nat'l Bank, 374 U.S. 321, 355, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963).

"[T]he test of a violation of § 7 is whether, *at the time of the suit*, there is a reasonable probability that the acquisition is likely to result in the condemned restraints." United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed. 2d 1057 (1957) (emphasis added); accord, United States v. Penn-Olin Chemical Co., 378 U.S. 158, 168, 84 S.Ct. 1710, 1716, 12 L.Ed.2d 775 (1964): "In any event, Penn-Olin was engaged in commerce at the time of the suit and the economic effects of an acquisition are to be measured at that point rather than at the time of acquisition."

■ It should be emphasized that Section 7 is concerned "with probabilities, not certainties," Brown Shoe Co. v. United States, 370 U.S. 294, 323, 323 n. 39, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and with effects on competition, not competitors. *Id.* at 320, 82 S.Ct. 1502. In determining the probabilities that a particular transaction would either substantially lessen competition or tend to create a monopoly, the two tests of illegality contained in Section 7, courts should avoid the exclusive use of mathematical tests. *Id.* at 321 n. 36, 82 S.Ct. 1502.

There is no difficulty here in determining "the 'line of commerce' (relevant product or services market) and 'section of the country' (relevant geographical market) in which to appraise the prob-

able competitive effects" of the acquisition. United States v. Phila. Nat'l Bank, *supra* 374 U.S. at 356, 83 S.Ct. 1715.

It is plaintiff's position that Coleman was a potential entrant to the snowmobile market, because it would have either independently entered the market by internal expansion, or had an "on the fringe" influence on the market, because it was perceived as a potential entrant.[2] United States v. Penn-Olin Chem. Co., *supra*.

The concern over some acquisitions by a potential entrant is that:

> [I]t merely assumes the position of that company [it replaced] without necessarily increasing competitive pressures. Had such a firm not entered by acquisition, it might at some point have entered *de novo*. An entry *de novo would* increase competitive pressures within the market, and an entry by acquisition eliminates the possibility that such an increase will take place in the future." United States v. Falstaff Brewing Corp., 410 U.S. 526, 560–561, 93 S.Ct. 1096, 1115, 35 L.Ed.2d 475 (1973).

■■ The "on the fringe" theory is that the fear of potential competition inhibits current market members from abusing competitive practices by such tactics as undersupplying the market or merely overcharging. United States v. Penn-Olin Co., *supra* at 378 U.S. 173–174, 84 S.Ct. 1710, 1718. The determination of whether or not the entering company had "on the fringe" influence is not "susceptible of a ready and precise answer," *id.*, but there must be evidence that the firm at the market's edge influenced firms within that market. United States v. Falstaff Brewing Co., *supra* at 531–537, 93 S.Ct. 1096; F.T.C. v. Proctor & Gamble Co., 386 U.S. 568, 580–581, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); United States v. Penn-Olin Co., *supra* at 175–176, 84 S.Ct. 1710.

■■ I cannot decide as a matter of law that Coleman had no thoughts of entering the snowmobile market by internal expansion. Management says it had no such intentions, but their statements have to be discounted because of self-interest. United States v. Falstaff Brewing Co., *supra*. Based on Skiroule's share of the market prior to its acquisition by Coleman and the lack of any claim by plaintiff that there will be evidence that other manufacturers perceived Coleman as a potential entrant or were concerned with Coleman at all as a possible competitor, I find the "on the fringe" theory inapplicable.

Finally, there can be no credible evidence that Coleman's entry into the snowmobile business substantially lessened competition. It is true that Skiroule's market share and position measured at their most optimistic placed it within Justice Department Guidelines concerned with conglomerate mergers. But Skiroule is barely within these Guidelines, and as noted, they are not to be applied with mathematical precision. This prohibition is particularly apt when dealing with companies at the fringes of the Guidelines.

No other evidence supports a conclusion of substantially lessened competition. There is no claim that Coleman had the "deep pocket" required to intimidate its competitors. 86 Harv.L. Rev., *supra* at 783, 783 n. 15. Further, as stated, in evaluating effect upon competition, "it is well settled that post acquisition evidence is admissible in an action such as this and may properly be considered in determining whether the probable effect of [the acquisition] will be a substantial lessening of competition . . . ." United States v. Falstaff Brewing Corp., 332 F.Supp. 970, 972 (D.R.I.1971) (citations omitted).

■■ The post-acquisition undisputed facts here are that Coleman lost both a percentage of the market and money.

---

2. It should be noted that the theory of independent entry "may still be applicable if the acquiring company has the option of entering by acquiring a substantially smaller firm than the one it acquires." Recent cases, 86 Harv.L.Rev. 772, 774 n. 15, 777 n. 26 (Feb. 1973).

These are not the sort of indicators sufficiently suggestive of adverse effect upon competitors within the market to require that the question be decided by the trier of fact.

B. Plaintiff alleges in Count VIII that the acquisition substantially lessened competition in New England with respect to Skiroule's snowmobiles.

Since I have already stated that Skiroule snowmobiles are not a discrete market, the question is whether or not there can be evidence that the acquisition substantially lessened competition in New England. The undisputed facts are that competition in New England substantially lessened Skiroule's share of and profits in the New England market.

IV. *The Automobile Dealers' Day in Court Act*

 Plaintiff alleges that snowmobiles fall within the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*, and that the termination of his dealership was a breach of "good faith" within the meaning of that Act. *See* 15 U.S.C. § 1222.

The Act does not include snowmobiles. While "automobiles" is not defined in it, "automobile manufacturer" is defined to mean manufacturers of "passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(a). Similarly "automobile dealers" is limited to those either selling or distributing "passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). Therefore, the plain meaning of the Act excludes snowmobiles. The letter and the intent of the Act's legislative history reinforce that exclusion.

The authors of the Act specifically deleted the words "or other automotive vehicles" from the Act "in order to limit the bill's coverage to manufacturer-dealer transactions involving the distribution of passenger cars, trucks, and station wagons." H.R.Rep.No.2850, 84th Cong., 2d Sess. (July 20, 1956), U.S.Code Congressional and Administrative News at 4601. The Explanation of the Act goes on to note that "[t]he amendment, therefore, *excludes* transactions involving buses, tractors, motorcycles, *and other transportation vehicles propelled by power.*" *Id.* (emphasis supplied).

Such exclusions are entirely consistent with the purpose of the Act that "the manifest disparity in the ability of franchised dealers of automotive vehicles to bargain with their manufacturers" be remedied. *Id.* at 4597. Disparity of that sort is probably not present in the snowmobile industry, which has dozens of manufacturers, but even if it were, I could not expand the legislature's statement that the Act is a response to an ascertained, "present [1956] need for remedial legislation." *Id.* at 4601. The Automobile Dealers' Day in Court Act clearly does not apply to snowmobiles.

The pleadings, depositions, and affidavits show that there is no genuine issue as to any material fact and the defendant is entitled to a judgment on the antitrust counts and the Automobile Dealers' Day in Court count as a matter of law.

The motion for summary judgment on Counts I–IV, VII and VIII is granted.

So ordered.